[No. 83606-0.   En Banc.]
Argued October 20, 2011.   Decided May 10, 2012.

*In the Matter of the Personal Restraint of* DAROLD RAY
STENSON, *Petitioner.*

476

*Robert H. Gombiner* (of *Law Offices of Robert Gombiner*); *Sheryl Gordon McCloud* (of *Law Offices of Sheryl Gordon McCloud*); and *Peter J. Avenia* (of the *Federal Public Defender*), for petitioner.

*Deborah S. Kelly, Prosecuting Attorney for Clallam County*, and *Pamela B. Loginsky* (of *Washington Association of Prosecuting Attorneys*), for respondent.

¶1 ALEXANDER, J.[*] — In 1994, Darold Stenson was sentenced to death after he was found guilty of murdering his wife, Denise Stenson, and business partner, Frank Hoerner. In 2009, Stenson's counsel filed the personal restraint

---

[*] Justice Gerry L. Alexander is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).

petition (PRP) that is before us now. In it he has raised a due process claim based on alleged violations of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Stenson's *Brady* claim pertained to evidence consisting of photographs and an FBI (Federal Bureau of Investigation) file that the State had access to at the time of trial but did not provide to Stenson's counsel until 2009. The question before us is whether the State violated Stenson's rights under the mandates of *Brady* and its progeny. Because we hold that it did, we reverse Stenson's aggravated first degree murder conviction as well as the sentence of death and remand for a new trial.

I

¶2 In the early hours of March 25, 1993, Darold Stenson called 911 from his home to report that his wife and business partner had been shot. A Clallam County deputy sheriff soon arrived at the scene and was directed by Stenson to the body of Frank Hoerner. Hoerner appeared to have died from a gunshot wound to the head. Stenson also directed the deputy sheriff to a bed within his home in which his wife, Denise, was lying with what appeared to be a bullet wound to her head. Denise Stenson later died at a hospital.

¶3 Stenson told the deputy sheriff that Hoerner had arrived at Stenson's office earlier that day, ostensibly to sign paperwork relating to a business deal. Stenson's office was located next to his house. Stenson explained that Hoerner later went into the house indicating his intent to use a bathroom. Stenson said he later went into the house to look for Hoerner and discovered that Hoerner and Denise Stenson had both been shot. Stenson indicated to the deputy sheriff that Hoerner may have shot Denise Stenson and then turned the gun on himself.

¶4 A subsequent investigation by the sheriff's office convinced them that Hoerner had not committed suicide

but, rather, had been beaten unconscious and dragged from Stenson's gravel driveway into the house. It was there, the investigators believed, that Hoerner had been shot in the head at close range.

¶5 Stenson was thereafter arrested and charged in Clallam County Superior Court with two counts of aggravated first degree murder. At the trial on the charges, the State's theory of the case was that Stenson had killed his wife to collect life insurance proceeds and then killed Hoerner to get out from under a debt he owed to Hoerner and to blame Hoerner for the murder of Denise Stenson.

¶6 Two key pieces of forensic evidence directly tied the defendant to the shootings: (1) gunshot residue (GSR)[1] found inside the front right pocket of jeans that Stenson was wearing when the officers arrived at his house and (2) blood spatter on the front of those jeans that was consistent with Hoerner's blood protein profile. *See* Reference Hr'g Findings & Conclusions (RHFC) at 18; *State v. Stenson*, 132 Wn.2d 668, 680, 940 P.2d 1239 (1997) (*Stenson* I). Stenson claimed that when he discovered Hoerner's body he kneeled next to it, suggesting that this may have accounted for the blood spatter on his jeans. An expert witness called by the State testified at trial that some of the blood spatter on Stenson's jeans could not have been deposited after Hoerner came to his final resting place on the floor. The remainder of the evidence presented by the State at trial was largely circumstantial.

¶7 A jury found Stenson guilty of both counts of aggravated first degree murder and concluded that there were not sufficient mitigating circumstances to merit leniency. Based on the verdicts, the trial court sentenced Stenson to death. Stenson appealed, and in 1997 this court affirmed both convictions and the death sentence. We have since rejected four PRPs filed by Stenson. *See In re Pers. Re-*

---

[1] GSR is created during discharge of a firearm and consists of small particles, visible only with magnification, that " 'float' " in the air and "are easily transmitted from one object to another." Reference Hr'g Findings & Conclusions at 4.

*straint of Stenson,* 142 Wn.2d 710, 16 P.3d 1 (2001) (*Stenson II*); *In re Pers. Restraint of Stenson,* 150 Wn.2d 207, 76 P.3d 241 (2003) (*Stenson III*); *In re Pers. Restraint of Stenson,* 153 Wn.2d 137, 102 P.3d 151 (2004) (*Stenson IV*); Order, *In re Pers. Restraint of Stenson,* No. 82332-4 (Wash. Nov. 19, 2008) (denying PRP as successive).

¶8 In 2008, Stenson's appellate counsel were notified that FBI Special Agent Ernest Peele, an expert witness who testified at Stenson's trial, had given testimony about bullet lead analysis in a manner that exceeded the scope of what that evidence could properly show. Although the bullet lead analysis evidence was of relatively little significance at trial, the information about Peele's flawed testimony raised additional questions for Stenson's counsel, who had already been reviewing the evidence in Stenson's case based on information they had received about other potential suspects. Armed with the new information about Peele's testimony, Stenson's counsel decided to " 'throw[ ] out as wide a net as they could' " to be able to present an " 'actual innocence' " claim. RHFC at 8. Accordingly, they requested the State to turn over all records relating to bullet lead analysis, GSR, and blood spatter testing.

¶9 The State responded in 2009 and disclosed evidence that had not previously been made available to the defense team, to wit: (1) photographs depicting Clallam County Sheriff's Detective Monty Martin wearing Stenson's jeans with the right pocket turned out and showing Martin's ungloved hands[2] and (2) an FBI file containing the GSR test results that revealed a person named Kathy Lundy, not Peele as Peele's testimony at trial implied, had performed the GSR tests at the FBI laboratory. Stenson then filed, without benefit of counsel, a fifth PRP, in which he claimed that his trial counsel had been ineffective because they failed to discover this previously undisclosed evidence prior to trial. *See In re Pers. Restraint of Stenson,* No. 83130-1

---

[2] *See* attach.

(May 26, 2009). Shortly thereafter, Stenson's appellate counsel filed this PRP, his sixth, alleging *Brady* and *Napue*[3] violations based on the previously undisclosed photographs and FBI file.[4]

¶10 We subsequently ordered Judge Williams of the Clallam County Superior Court, the judge who had presided over Stenson's trial, to conduct a reference hearing. The reference hearing pertained to questions about whether the evidence disclosed in 2009 was, in fact, newly discovered.[5] At the conclusion of the reference hearing, which occurred over a two week period in January 2010, Judge Williams made numerous findings of fact, some of which we set forth hereafter:

> [P]hotographs ... show[ ] Mr. Stenson's pants being handled[6] by an ungloved law enforcement officer, with the pockets turned inside out, six days prior to the pockets being sampled for gunshot residue.

RHFC at 3.

> Martin took Mr. Stenson's pants to Mr. [Rod] Englert [at Intermountain Laboratory in Portland, Oregon] on the 14th of April, 1994. Mr. Englert suggested to Detective Martin that Mr. Stenson's pants pockets be tested for GSR. The pants pockets were turned out [on] that date to look for blood evidence.

*Id.* at 9.

---

[3] *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959).

[4] The decision we render in this opinion, which is based primarily on arguments presented in Stenson's sixth PRP, renders it unnecessary for us to address the arguments Stenson makes in his fifth PRP.

[5] We ordered Judge Williams to determine whether Stenson satisfied the substantive newly discovered evidence test. *See Stenson* IV, 153 Wn.2d at 147 (stating that the substantive newly discovered evidence test requires a petitioner to show the evidence (1) will probably change the result of the trial or proceedings, (2) was discovered since the trial or proceedings, (3) could not have been discovered before the trial or proceedings by the exercise of due diligence, (4) is material, and (5) is not merely cumulative or impeaching). Stenson's counsel later clarified that he was not raising a substantive newly discovered evidence claim but was instead asserting a *Brady* claim on the basis of evidence that was newly discovered.

[6] Martin admits he is wearing the pants in the photographs.

> On April 20, 1994, in Detective Martin's garage, GSR sampling dabs of the pants pockets were taken as well as lumin[o]l testing of the pants. The pants pockets were again turned inside out. . . . The dab samples were then sent to the FBI.

*Id.* at 10.

> Prior to trial there were numerous hearings and discovery orders entered . . . compelling the State to provide the defense with all evidence "favorable to the defense on the issue of guilt and to provide the defense with the name of every expert witness and a copy of that witness's report" [and the] "reports, letters and conclusions prepared by or on behalf of lab or other forensic experts."

*Id.* at 1-2 (quoting Reference Hr'g Exs. 10-11).

> The testimony is that the photographs were available to investigators representing both the State and the defense. The testimony of Mr. Englert is that [he] met with the defense investigator Walker . . . and that the entire file which included the photographs was on the table. Mr. Walker's reports note the existence of [the] photographs and describe several of them. Two copies of the photographs were printed. Only one remains in Mr. Englert's file. Mr. Walker's report states that Mr. Englert suggested he get copies of the file and photographs from the Prosecuting Attorney as it would be cheaper. Mr. Englert told Mr. Walker that Detective Monty Martin had a copy of the photographs. Mr. Englert was paid for mailing. The testimony at the reference hearing was that neither Detective Martin nor the Prosecuting Attorney recalled receiving copies of the pictures. Mr. Englert testified that he would not have released the pictures or his file to the defense team without permission. Prosecuting Attorney [David] Bruneau testified that he had never seen the photos nor knew the pants pockets had been turned out . . . until 2010. A motion for discovery of the Englert notes was filed and argued and the notes were provided [but the photographs were not]. However at the same time the Prosecuting Attorney stated that Mr. Englert would not be called as a witness.

*Id.* at 21-22.

Nothing in materials provided to [the] defense [team] stated that the Englert examination included turning the pockets out and anyone being ungloved. It was reasonable to assume, as [the] defense did, that nothing in Mr. Englert's possession would have had any relevance to GSR or even to the case once it was determined that Mr. Englert would not be testifying.

*Id.* at 23.

Trial commenced with motions on June 6, 1994.

*Id.* at 2.

Special Agent Peele issued his two page report on the 13th of June, 1994. This report was received by the defense on June 20, 1994. At the time of receipt of the GSR report trial had already commenced and jury selection was well underway. At that time the defense was dealing primarily with other forensics issues, particularly blood spatter issues which also arose near the trial date. The blood spatter issues were the subject of a request for trial continuance and/or dismissal which was hotly contested due to the lateness of the issue being raised.

*Id.* at 10.

[Peele] testified at trial that gunshot residue was found in Mr. Stenson's right, front pocket.

*Id.* at 4.

Detective Martin was present when Special Agent Peele testified in 1994.

*Id.* at 5.

Special Agent Peele assumed the dab sampling test was done on the pockets during the early stages of the investigation before everything was handled or "fooled with." In actuality the dabs had only been taken at late stages of the investigation and more than one year after the pants were seized and after the pants had traveled to the FBI Laboratory in the Hoover Building in Washington, D.C., to the Intermountain Laboratory in Portland, Oregon, and to other places.

> . . . In 2005 it was learned the Hoover Building, which contained two shooting ranges, was itself contaminated with GSR.

*Id.* at 4 (quoting Reference Hr'g Ex. 14).

> The lab notes indicate that Kathy Lundy, not Agent Peele, had actually performed the testing for GSR and that only four grains of GSR had been found after a series of examinations. (Dr. [Jean] Arvisu believes the data supports only two grains.)

*Id.* at 9.

> Unless a massive amount of GSR is found the number of particles is of relative insignificance.

*Id.* at 5.

> All parties knew the bench notes existed. The bench notes well may have been literally in front of all the parties at the time of trial. Neither party apparently believed there was anything worth looking at in the FBI file. If, however, the material contained exculpatory or impeaching matter it should have been provided to defense counsel under *Brady*. Defense counsel had a right to rely on that requirement as well as its own reasonable assessment of need to further inquir[e] into the file and therefore had no duty to pursue further discovery when no materiality appeared likely.

*Id.* at 15.

¶11 Relying on his findings of fact, Judge Williams determined that based on the evidence submitted at the reference hearing, the "information in the photographs . . . is sufficient to cause subsequent [GSR] tests to be wholly unreliable," and in this regard, the "photographs would lead to the elimination of the GSR evidence" at trial. *Id.* at 24. He further held that

> the content of the Englert photographs do[es] not merely show another possible source of contamination, they show a potential source of contamination which rises to such a degree that subsequent finding of GSR in the pants pocket no longer has *any* evidentiary viability in light of the potential for unfair prejudice to the defendant.

*Id.* at 24-25 (emphasis added). Judge Williams concluded further that had the "ungloved handling and the turning out of the pockets been known to the trial court and an appropriate objection made, the GSR testimony would have been excluded." *Id.* at 17-18. He went on to say that because "the GSR testimony was one of only two pieces of evidence from which inferences directly tying the defendant to the shootings themselves could reasonably be drawn (the other being blood spatter), it would be hard to say that an error in admitting the GSR testimony would have been harmless." *Id.* at 18.

¶12 During the reference hearing proceedings Stenson's counsel asked Judge Williams to additionally decide whether, based on the evidence presented, the State had violated Stenson's rights under *Brady*. Judge Williams declined to answer that question on the basis that *Brady* determinations were outside the scope of this court's order.

¶13 In response to our specific questions, Judge Williams determined that under the substantive newly discovered evidence test, the FBI file and photographs would not have probably changed the outcome of the trial and the FBI file was not material. Significantly, however, he also concluded that under RCW 10.73.100(1), Stenson and his counsel acted with reasonable diligence in discovering the new evidence and in filing this PRP.

¶14 After reviewing Judge Williams's findings, we ordered him to conduct a second reference hearing to determine whether the State had violated Stenson's due process rights under *Brady*. Judge Williams concluded after the second reference hearing that based on the facts above, Stenson satisfied the first two *Brady* factors, i.e., that the evidence was favorable to Stenson and that the State wrongfully suppressed it. He went on to conclude, however, that the third *Brady* factor, prejudice, was not shown.

## II

■■ ¶15 A petitioner is generally prohibited from filing a PRP more than one year after the judgment becomes final if the judgment and sentence is valid on its face and was rendered by a court of competent jurisdiction. RCW 10.73.090(1). That time limit does not, however, apply to a PRP that is based solely on grounds set forth in RCW 10.73.100. One of the grounds set forth in that statute is "[n]ewly discovered evidence, if the defendant acted with reasonable diligence in discovering the evidence and filing the petition." RCW 10.73.100(1). Stenson's PRP is based on evidence that was disclosed to the defense in 2009, thus the evidence is newly discovered. Judge Williams also properly determined that Stenson and his counsel acted with reasonable diligence in discovering that evidence and filing the PRP. *See* RHFC at 25-29. Stenson, therefore, satisfies the procedural requirements for filing this PRP.

## III

## A

■ ¶16 Our court has stated that " '[b]ecause the death penalty qualitatively differs from all other punishments, there must be reliability in the determination that death is the appropriate punishment.' " *State v. Woods*, 143 Wn.2d 561, 603, 23 P.3d 1046 (2001) (quoting *State v. Lord*, 117 Wn.2d 829, 888, 822 P.2d 177 (1991)). A court's " 'duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.' " *Kyles v. Whitley*, 514 U.S. 419, 422, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) (quoting *Burger v. Kemp*, 483 U.S. 776, 785, 107 S. Ct. 3114, 97 L. Ed. 2d 638 (1987)). The stakes are at their highest when, as here, a petitioner sentenced to death claims actual innocence. Indeed, three justices of the United States Supreme Court have stated that it " 'would be an

atrocious violation of our Constitution and the principles upon which it is based' to execute an innocent person." *In re Davis*, 557 U.S. 952, 954-55, 130 S. Ct. 1, 174 L. Ed. 2d 614 (2009) (Stevens, J., concurring) (transferring case to United States District Court to determine whether evidence that could not have been obtained at the time of trial clearly established Davis's innocence (quoting *In re Davis*, 565 F.3d 810, 830 (11th Cir. 2009) (Barkett, J., dissenting))), *cert. denied*, 131 S. Ct. 1787 (2011).

¶17 The underlying notion behind the United States Supreme Court's decision in *Brady* is that "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair." *Brady*, 373 U.S. at 87. In *Brady*, the Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* The United States Supreme Court has since held that there is a duty to disclose such evidence even when there has been no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). The scope of the duty to disclose evidence includes the individual prosecutor's " 'duty to learn of any favorable evidence known to the others acting on the government's behalf . . . including the police.' " *Strickler v. Greene*, 527 U.S. 263, 281, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999) (quoting *Kyles*, 514 U.S. at 437 (rejecting the State's invitation to adopt a rule that the State "should not be held accountable under *Bagley* and *Brady* for evidence known only to police investigators and not to the prosecutor," *id.* at 438)).

¶18 Significantly, "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is

impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Id.* at 281-82. With respect to the third *Brady* factor, the terms "material" and "prejudicial" are used interchangeably. *See United States v. Price*, 566 F.3d 900, 911 n.12 (9th Cir. 2009).

¶19 Over time, the United States Supreme Court's explanations of the *Brady* standard have resulted in a decidedly nuanced body of case law. With this in mind, we heed that Court's advisement to take into account several aspects of the materiality analysis that bear particular emphasis. *See Kyles*, 514 U.S. at 434. One of the most important characteristics is that it is "not a sufficiency of evidence test." *Id.* (relying on *Bagley*, 473 U.S. 667). Thus, a "showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Id.* The question "is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.*

¶20 What, then, must a petitioner show to prove materiality? He or she must show " 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Id.* at 433-34 (quoting *Bagley*, 473 U.S. at 682 (opinion of Blackmun, J.); *id.* at 685 (White, J., concurring in part, concurring in judgment)). A " 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Id.* at 434 (quoting *Bagley*, 473 U.S. at 678). One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but rather by showing that the favorable evidence could reasonably be taken to put the whole case in a different light. The suppressed evidence must be considered collectively, not item by item.

## B

¶21 The first two *Brady* factors are factual questions, and the " 'substantial evidence' " standard is the standard of review for factual findings in PRP reference hearings. *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 410, 972 P.2d 1250 (1999) (quoting RAP 16.14(b)). " 'Substantial evidence exists when the record contains evidence of sufficient quantity to persuade a fair-minded, rational person that the declared premise is true.' " *Id.* (quoting *Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 112, 937 P.2d 154, 943 P.2d 1358 (1997)). We defer to the trial court and will not "disturb findings of fact supported by substantial evidence even if there is conflicting evidence." *Merriman v. Cokeley*, 168 Wn.2d 627, 631, 230 P.3d 162 (2010). The third *Brady* factor, prejudice, is a mixed question of law and fact. *See Price*, 566 F.3d at 907 n.6; *see also Summers v. Dretke*, 431 F.3d 861, 877-78 (5th Cir. 2005). We review mixed questions de novo by applying the reference hearing facts to the law and drawing our own legal conclusions. *In re Pers. Restraint of Brett*, 142 Wn.2d 868, 874, 16 P.3d 601 (2001).

### i

¶22 The State assigns error to Judge Williams's findings that the FBI file was favorable to Stenson and that the FBI file and photographs were suppressed by the State. As we have observed, Judge Williams found that the FBI file is favorable to Stenson because, had it been properly disclosed, his counsel could have used it for impeachment purposes during Peele's testimony.[7] In that regard, Judge Williams stated that the GSR test results were admitted into evidence "based on the expert qualifications of . . . Peele, without the defense counsel's ability to challenge the

---

[7] "[I]mpeachment evidence" is defined as "[e]vidence used to undermine a witness's credibility." BLACK'S LAW DICTIONARY 637 (9th ed. 2009). "[I]mpeach" means to "discredit the veracity of (a witness)." *Id.* at 820.

expert credentials of the actual examiner of the GSR swabs" and that they "could serve to impeach the credibility of the results, and potentially undermine the State's argument as to the professionalism of its witnesses." Mem. Op. at 6-7. This finding is significant because Peele's testimony contained a false implication that he had personally performed the GSR tests. If Stenson's trial counsel had known that Lundy performed the GSR tests, they could have attempted to undermine the veracity of Peele's testimony. Additionally, they were precluded from cross-examining Lundy regarding her qualifications to perform the GSR testing. The United States Supreme Court has recognized the potential value in cross-examining forensic analysts. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 328, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009) (stating that "[l]ike expert witnesses generally, an analyst's lack of proper training or deficiency in judgment may be disclosed in cross-examination"). Here, Stenson's counsel was unable to examine Lundy because the full FBI file was never disclosed to them—thus, they were unaware of Lundy's involvement with the GSR testing. Moreover, it was not until the full FBI file was disclosed that it became clear that only a few particles of GSR were found in Stenson's jeans pocket. This fact, therefore, went unexamined at Stenson's trial. We will not "disturb findings of fact supported by substantial evidence even if there is conflicting evidence." *Merriman*, 168 Wn.2d at 631. In our view, there is substantial evidence to support Judge Williams's finding that the FBI file qualifies as impeachment evidence for *Brady* purposes and that the evidence was favorable to Stenson on the issue of guilt.[8]

ii

¶23 The State also assails Judge Williams's finding that the State failed to disclose the FBI file to Stenson, render-

---

[8] The State does not claim that Judge Williams erred in finding that the photographs are favorable to Stenson. *See* Suppl. Br. Addressing Judge Williams' Determinations Entered on Jan. 20, 2011, at i.

ing it "suppressed" for *Brady* purposes. As noted above, Judge Williams determined that "the FBI Lab bench notes relat[ing] to GSR testing were not provided to the defense in any meaningful manner even if they were perhaps available in Special Agent Peele's briefcase at the time he testified." Mem. Op. at 8. Judge Williams found in the first reference hearing that "there was no lack of due diligence by defense trial counsel or defense counsel on subsequent PRPs in failing to discover the full FBI file material." RHFC at 15. There is substantial evidence to support Judge Williams's determination that the State suppressed the FBI file under *Brady*.

¶24 Insofar as Judge Williams's finding that the photographs were suppressed by the State is concerned, the State contends that it did not suppress the photographs because Walker, the defense investigator, had access to the photographs during his meeting with Englert. Judge Williams, however, resolved this factual question in Stenson's favor, finding that even if Walker had reviewed the photos, there was no disclosure to defense counsel at the time Peele testified or at any other time "that something had gone into the pocket. [The fact that Martin put his ungloved hand in the pocket] should have been disclosed." Mem. Op. at 7-8. As noted above, Judge Williams explained in the first reference hearing findings that because the State did not properly disclose that information, it was reasonable for the defense to assume that nothing in Englert's possession would have any relevance to GSR or otherwise be relevant to the case.

¶25 Judge Williams concluded after the second reference hearing that "the Englert photos and the fact of Detective Sergeant Martin's handling of the pants in the manner indicated in the photos was 'suppressed' for *Brady* analysis purposes." Mem. Op. at 8. Judge Williams's determination that the photographs were wrongfully suppressed by the State is supported by substantial evidence in the record.

iii

■ ¶26 The most significant issue before us is whether the State's failure to disclose the evidence prejudiced Stenson. Judge Williams concluded that Stenson was not prejudiced. As we have already observed, the question of prejudice turns on our de novo review of whether Stenson has shown that the government's evidentiary suppression undermined confidence in the outcome of his trial. *See Kyles*, 514 U.S. at 434. Stenson has made this showing.

¶27 Our conclusion that Stenson did suffer prejudice is shaped largely by the fact that only two pieces of forensic evidence formed the basis for Stenson's conviction—GSR and blood spatter. Judge Williams concluded after the first reference hearing that "[h]ad the ungloved handling and the turning out of the pockets been known to the trial court and an appropriate objection made, the GSR testimony would have been excluded [at trial]." RHFC at 17-18. Both items of evidence were instrumental to the State's case and, since the discovery of the FBI file and photographs, cumulative reliability of the forensic evidence in this case has been greatly undermined. Had the defense trial team been privy to the suppressed evidence at issue here, the integrity and quality of the State's entire investigation, evidence handling procedures, and case presentation would have been called into question. Stenson's counsel aptly made this point in its brief addressing Judge Williams's determinations:

> To rebut claims that the investigation was meticulous, impeccable, and highly professional, Stenson could point to the haphazard and cavalier way in which critical pieces of evidence were treated. He could show that the lead investigator was biased, or suffered from memory problems. He could show that at least one state's expert (Peele) testified misleadingly, implying that he had personally conducted forensic tests when in fact they had been done by a trainee assistant. He could argue that the state had knowingly proffered worthless forensic evidence

and then touted it in closing as highly probative of guilt. The mishandling of the pants would serve as a prime example of why the state's evidence, witnesses, and arguments should all be viewed with extreme skepticism.

Given the opportunity to impeach not only the useless GSR evidence but the state's entire investigation, competent defense counsel would have been able to undermine confidence in the state's case against Stenson. By the end of the trial, one of the key pieces of inculpatory evidence would have been completely neutralized, and the rest of the state's case would have appeared much less solid.

Pet'r's Br. Addressing Reference Ct.'s Findings of Jan. 20, 2011, at 16-17 (footnotes and citations omitted).

¶28 In *Kyles*, the United States Supreme Court noted that had the favorable evidence been disclosed to the jury, then the jury would have counted "the sloppiness of the investigation against the probative force of the State's evidence. . . . [I]ndications of conscientious police work will enhance probative force and slovenly work will diminish it." *Kyles*, 514 U.S. at 446 n.15. Had the FBI file and photographs been properly disclosed here, Stenson's counsel would have been able to demonstrate to the jury that a key exhibit in the case—Stenson's jeans—had been seriously mishandled and compromised by law enforcement investigators. It is also likely that exposure of the State's mishandling of the jeans with regard to GSR testing would have led to further inquiry by Stenson's counsel into possible corruption of the blood spatter evidence. In that regard, Stenson's defense theory at trial could have taken into account the fact that the jeans may have been folded over when the blood spatter was wet. Instead, the jury was left with only one explanation for the blood spatter, which was that it could not have appeared on Stenson's jeans after Hoerner came to his final resting place.

¶29 We are left with the fact that constitutionally significant mistakes were made in Stenson's trial, resulting in imposition of the ultimate punishment without the full

benefit of due process protections. The question here is not whether Stenson has proved his innocence; that is not his burden under *Brady*. As the United States Supreme Court said in *Kyles*, "the question is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same." *Kyles*, 514 U.S. at 453.[9] Under *Brady* and its progeny, we are to consider whether one juror might have had reasonable doubt that Stenson was guilty or deserving of the death penalty if (1) the State had never introduced evidence that Stenson's jeans pocket and hand had been in a "shooting environment," Reference Hr'g Ex. 90, at 1779; (2) the defense team properly impeached the credibility of the detectives' investigation techniques and showed the extent to which the law enforcement officers mishandled the evidence; and (3) the defense team had the benefit of the undisclosed evidence to create a persuasive defense theory of the case. Stenson, in our judgment, has met his burden of showing that there is a *reasonable probability* that had the FBI file and photographs been disclosed to the defense, the result of his trial would have been different. Because we believe the newly discovered evidence undermines confi-

---

[9] The United States Supreme Court recently reiterated the rule it stated in *Kyles* in *Smith v. Cain*, ___ U.S. ___, 132 S. Ct. 627, 181 L. Ed. 2d 571 (2012). In the majority decision, which was signed by eight of the nine justices, the Court said that under *Brady*, previously undisclosed " 'evidence is "material" . . .when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.' " *Id.* at 630 (quoting *Cone v. Bell*, 556 U.S. 449, 469-70, 129 S. Ct. 1769, 173 L. Ed. 2d 701 (2009)). The Court went on to say that "[a] reasonable probability [means] that the likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of the trial.' " *Id.* (last alteration in original) (quoting *Kyles*, 514 U.S. at 434). Significantly, Smith's first degree murder conviction was reversed by the United States Supreme Court because of the State of Louisiana's failure to disclose to the defense a statement of a material witness that was known to the State's lead investigator and that conflicted with the trial testimony of the witness.

dence in the jury verdict, we reverse Stenson's convictions and death sentence and remand for a new trial.[10]

## IV

¶30 We conclude that the trial court correctly found that the FBI file and photographs are favorable to Stenson and that the evidence was wrongfully suppressed by the State. We conclude, as a matter of law, that the suppression of the photographs and FBI file prejudiced Stenson. Accordingly, we grant Stenson's sixth PRP and reverse his convictions and death sentence and remand for a new trial. Because of our determination, we dismiss Stenson's fifth PRP as moot.

MADSEN, C.J.; C. JOHNSON, CHAMBERS, FAIRHURST, STEPHENS, and WIGGINS, JJ.; and KULIK, J. PRO TEM., concur.

---

[10] Because we reverse Stenson's convictions and death sentence on the basis that the State violated *Brady*, we do not address Stenson's argument based on *Napue*, 360 U.S. 264, that the State "committed intentional acts of misconduct at trial by permitting false and misleading evidence and argument to be presented to the jury." Pet'r's Br. Addressing Reference Ct.'s Findings at 20.

ATTACHMENT

¶31 J.M. JOHNSON, J. (dissenting) — I respectfully disagree with the majority opinion in this case and would deny Darold Stenson's fifth and sixth personal restraint petitions. A jury heard weeks of testimony and in 1994 unanimously found Stenson guilty beyond a reasonable doubt of the aggravated murder of his wife and business partner. This court has reviewed and affirmed both guilt and sentence over the intervening 18 years. The trial judge, Judge Williams, on two separate remands from this court, held that the alleged nondisclosed *Brady*[11] evidence here did not meet the requirement of prejudice. Based on these findings, we must conclude that the elements of the *Brady* test are not met. Accordingly, we should deny Stenson's fifth and sixth personal restraint petitions and uphold his conviction. The interests of finality in justice to provide peace for the families of Stenson's victims argue for the same result. Thus, I dissent.

## A. Totality of Evidence

¶32 The majority opinion fails to consider the totality of evidence before the jury and exaggerates the potential prejudice of a late-discovered photo of Stenson's pants with the right pocket pulled out, where some gunshot residue (GSR) evidence was found.

¶33 In March 1993, Stenson had arranged for both victims to be at his home at 3:30 a.m. Shortly after the murders, Stenson made a 911 call suggesting that his business partner, Frank Hoerner, murdered Stenson's wife and then committed suicide. However, that account was quickly proved false (and there has never been another viable suspect). The evidence indicated that the murder gun was placed on Hoerner's hand after his death. The evidence at trial also established that Hoerner "had been beaten unconscious, [and] dragged into the [Stenson] house from the gravel driveway . . . where he was shot in the head at close

---

[11] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

range." *State v. Stenson*, 132 Wn.2d 668, 679, 940 P.2d 1239 (1997). Stenson owed Hoerner $50,000 that he could not pay. Further, Stenson had insured his wife for more than $400,000. She was the second victim. These two crimes solve Stenson's financial problems, a powerful motive.

¶34 The weapon used to beat Hoerner unconscious outside before he was dragged inside and shot was consistent with a missing set of nunchaku sticks that were displayed on the wall of Stenson's office. Investigation also uncovered Hoerner's blood in the driveway and laundry room and Stenson's bloody fingerprint on the freezer inside the house. There was blood spatter on Stenson's pants. Some of the blood spatter fit Hoerner's blood profile and could have been deposited only before Hoerner came to his final resting place. This evidence flatly contradicted Stenson's claim to the jury that Hoerner went voluntarily into the house to use the restroom.

¶35 Moreover, the reliability of the GSR evidence tangentially challenged here had already been impeached before the jury with other evidence (Stenson had been restrained in the back of a sheriff's car that had been used by gun carrying officers). In light of all these considerations, the "new" question with respect to the GSR evidence cannot meet the *Brady* requirement of prejudice. The trial court decision of a sworn jury and two separate reviews by Judge Williams should be upheld.

B. Overwhelming Blood Spatter and Other Evidence

¶36 Contrary to the majority's argument, none of the alleged anomalies with the GSR evidence significantly impact the reliability of the blood spatter evidence or any other evidence presented at trial. The defense knew that the jeans may have been folded over when wet but did not argue this to challenge the blood spatter evidence. It is not likely that other contaminating sources for the GSR evi-

dence would have a potent effect.[12] Defense had argued the exposure in a police car could have caused the contamination.

¶37 While the majority emphasizes the importance of scrutinizing convictions with painstaking care, the interests of justice require some balance. That system of justice relies on juries to determine guilt or innocence and should defer to such decisions.

¶38 The majority also overstates the importance of the GSR evidence, a matter of only several grains of powder mentioned only *once* in passing in all this court's prior decisions affirming Stenson's conviction. The majority also fails to present a compelling reason that this alleged *Brady* evidence meets that test's requirement that prejudice be shown, especially given the victim's blood spatter on the front of Stenson's jeans and the mountain of other evidence linking Stenson to the crime. The jury convicted Stenson after a four-week trial, and Judge Williams, on special remand from this court, expressly found that the third *Brady* requirement of prejudice was not met. We should defer to the jury and trial court in its findings of fact and affirm the court's decision on the legal question of prejudice. Both heard all the evidence; this court has heard arguments. Note too that the victims' families were never heard in this court.

¶39 The alleged *Brady* evidence also does not give rise to a reasonable probability that, had the evidence been disclosed earlier, the jury result would have been any different. *Kyles v. Whitley*, 514 U.S. 419, 433-34, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1982)). In light of the mountain of other evidence in this case, four particles of GSR evidence was not a key piece of forensic

---

[12] One last theory is still argued: that the FBI lab in Washington, D.C., was in a building with a target range in the basement. A jury is unlikely to consider this a *probable contaminant source.*

evidence supporting the conviction. *See Stenson*, 132 Wn.2d at 679-80.

¶40 Trial Judge Williams expressly indicated that the blood spatter evidence on Stenson's jeans was the most compelling evidence at trial. Even without the blood spatter evidence, the circumstantial evidence alone is overwhelming. The majority's decision substitutes its own judgment for those who actually heard the facts and totally disregards the jury, Judge Williams, and the victims of this heinous crime.

¶41 As a result, the alleged "new" *Brady* evidence is not sufficient "to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. We thus should deny Stenson's fifth and sixth personal restraint petitions.[13]

CONCLUSION

¶42 I would affirm the jury conviction and Judge Williams' findings of no prejudice and deny Stenson's fifth and latest petitions. The majority fails to take the totality of evidence into consideration in its evaluation. None of the

---

[13] Stenson's fifth personal restraint petition claims ineffective assistance of counsel because of the alleged failure on the part of counsel to discover anomalies with respect to the GSR evidence. The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution protect the right to effective assistance of counsel in criminal cases. *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Thomas*, 109 Wn.2d 222, 229, 743 P.2d 816 (1987). To prevail on an ineffective assistance of counsel claim, the defendant must show not only deficient performance on the part of counsel but also prejudice. *Strickland*, 466 U.S. at 687; *Thomas*, 109 Wn.2d at 226. We should deny Stenson's fifth petition because Judge Williams found that Stenson's counsel acted with reasonable diligence in discovering the alleged anomalies with the GSR evidence and in filing Stenson's sixth personal restraint petition alleging *Brady* and *Napue* violations. *See* majority at 484. This finding demonstrates that there was no deficient performance on the part of Stenson's counsel. Additionally, we should deny Stenson's fifth personal restraint petition because the alleged anomalies with the GSR evidence do not give rise to a reasonable probability that had the evidence been disclosed to the defense, the jury would have reached a different verdict. *See Kyles*, 514 U.S. at 433-34. Thus, the prejudice requirement has not been met under Stenson's ineffective assistance of counsel claim or under his *Brady* claim, and we should deny his fifth and sixth personal restraint petitions.

alleged anomalies with the GSR evidence affect the credibility of the blood spatter evidence or the mountain of other circumstantial evidence that was presented against Stenson at trial. His debts to his business partner and the $400,000 insurance proceeds from his wife's death provided motive enough. The extraordinary 3:30 a.m. presence of the victims at Stenson's home was admittedly arranged only by Stenson. We should not disregard the *Brady* requirement that prejudice be shown, as it is a limited remedy for unfair trials or improper convictions. Here, the jury verdict was fair and based on overwhelming evidence. Thus, I would uphold Stenson's conviction and leave the victims (families) at peace. I dissent.