IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 39718-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOSHUA KENNETH LEONARD, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

COONEY, J. — Joshua Leonard was convicted of attempted rape of a child in the second degree and communicating with a minor for immoral purposes. His charges stemmed from an undercover operation in which law enforcement personnel posed as underage girls on a popular online chatting forum.

Mr. Leonard appeals, requesting we remand for the trial court to strike the crime victim penalty assessment (VPA) and DNA collection fee and to strike or amend a community custody condition that places restrictions on romantic relationships. The State concedes these issues.

Mr. Leonard also filed a statement of additional grounds for review (SAG) in

which he argues: the State committed a *Brady*[1] violation, and the court admitted evidence

that was inadmissible under ER 404(b), the prosecutor committed misconduct during

closing argument, a violation of his right to a speedy trial, and the trial judge was biased

against him. We disagree with each of Mr. Leonard's arguments and affirm his

convictions.

BACKGROUND

In August 2022, the Washington State Patrol's Missing and Exploited Children

Task Force conducted an online, undercover operation in Grant County, Washington, in

which several officers posed as minors on a popular chatting website called Skout.

During the operation, Detective Jake Klein posed as a 12-year-old girl named Crystal.[2]

Using Skout, Mr. Leonard began messaging who he believed to be Crystal.

Mr. Leonard had multiple video conversations with Crystal, who was portrayed by a

youthful looking undercover female officer on video and in photographs. During one

video conversation, Mr. Leonard informed Crystal of the length of his penis. During

another video call, Mr. Leonard "nodded" when asked by Crystal whether he had

condoms. Rep. of Proc. (Feb. 9, 2022) (RP) at 117. In that same call, Crystal also asked

---

[1] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[2] Detective Klein's undercover persona is referred to as Crystal for clarity.

Mr. Leonard if they were "definitely going to bang" to which he nodded. RP at 116.

Crystal told Mr. Leonard she would "look up a place" to meet and send the location to

him. RP at 117. Mr. Leonard followed Crystal's instructions and was arrested upon

arriving at the predetermined location.

Mr. Leonard was charged with attempted rape of a child in the second degree and

communication with a minor for immoral purposes. The case was tried by the court

sitting without a jury. On the third day of trial, the court heard argument on Mr.

Leonard's motion to exclude evidence. Defense counsel argued the State disclosed a

police report from Othello Police Department Detective Martinez[3] "about 15 minutes

before trial." RP at 149. Defense counsel argued it was a violation of the discovery rules

and the State's duty to provide exculpatory evidence to the defense.

The State responded that Detective Martinez's report was drafted after opening

statements because the State realized Mr. Leonard may have been communicating online

to another undercover persona. The State argued:

> Based off of the information that Defense counsel shared during his
> opening statements is the first time that the State formally knew the
> Defense's theory of the case. He did list general denial on this application
> and that's how he was moving forward which could mean many different
> things.
> . . . .
> It was until the defense stated a few positions regarding the
> Defendant going to the Samaritan Hospital and the CNA[4] that it posed a

---

[3] It is unclear from the record what Detective Martinez's first name is.
[4] Certified nursing assistant.

question essentially in our head if the Defendant potentially was speaking
with another individual that he thought was 12, and mistaken with
undercover in this operation.

RP at 152.

The State asserted it shared the report with the defense as soon as it was written:

The State disclosed that as soon as possible. We contacted the undercover
chatter and had him write a report immediately about that specific
conversation, but those messages between the Defendant and that
undercover chatter were on the Defendant's cell phone and were previously
provided to Defense. The State did advise that we may potentially have to
use this as impeachment, or as rebuttal.

RP at 152. Ultimately, the court ruled that there was no discovery violation.

Defense counsel also argued that the report was inadmissible under ER 404(b)

because it was being offered to show propensity. The State argued that it did not "know

for certain if this will be relevant until the testimony comes out because it would be

rebuttal. It depends on what the Defendant ends up testifying to." RP at 157. The court

reserved ruling on the issue.

Among other trial witnesses, the State called Special Agent Andrew Chace, a

digital forensic examiner, to testify regarding the information found on Mr. Leonard's

cell phone. Special Agent Chace testified that he extracted text messages from Mr.

Leonard's phone. Regarding whether Mr. Leonard deleted text messages, Special Agent

Chace testified:

Q And I apologize if I repeat myself, but I want to make sure I'm
clear. Does the Cellebrite software have the capability of extracting deleted
data from a cell phone?

4

A It does.

. . . .

Q Does it always recover deleted data off of every device?
A No. It's dependent on the make and model of the phone and also if the data has been purged or overwritten by the operating system.
Q In this case, when you reviewed the cell phone in this case, was there any deleted data recovered?
A I didn't see any deleted messages.
Q And what process exists to ensure that the copies or the Cellebrite report, such as the report from Plaintiff's Exhibit P75 of the text messages between this device and the undercover device. What process is there in existence to ensure that those copies are an exact match to the data pulled from the phone?
A The best way to do it would be to compare the extraction with the handset and just make sure that the data matches.

. . . .

Q Did you confirm that the messages that were extracted from this phone using Cellebrite, Plaintiff's Exhibit 75, matched the messages that are on the device in this case?

A The messages that were on the device are the same ones that are in the extraction?
Q Yes.
A Yes.
Q And if there were messages on the undercover device that were either sent to or from the device in Exhibit 83 that are now no longer there, what does that mean?
A It indicates to me that they were deleted.

RP at 422-23, 426.

Mr. Leonard testified in his own defense. He testified that, in addition to Crystal, he was also chatting with another undercover persona named Alice who was posing as a 12-or 13-year-old girl. He also claimed Crystal and Alice were the only two underage individuals he spoke with between August 22 and 23.

5

Following Mr. Leonard's testimony, the State sought to call Detective Martinez to testify as a rebuttal witness. The State planned to elicit testimony from Detective Martinez that Mr. Leonard actually spoke to three undercover, underage profiles, contrary to his testimony that he only spoke to two undercover profiles. Defense counsel objected to the proffered testimony, arguing that the fact that Mr. Leonard spoke to a third undercover profile was "completely irrelevant." RP at 524.

The State claimed the evidence was relevant because "we have an individual that said that he has no interest in minor females and was only having conversations with two minor females—not just during that time period, but ever [sic] on S[k]out, when in fact it appears that he had conversations with three." RP at 521. The State said this information was going to be used as rebuttal evidence and to impeach Mr. Leonard's credibility. However, the court stated that it was "not considering this as impeachment evidence" but instead as "rebuttal testimony." RP at 526.

The court concluded the information was relevant "to tie in to the overall picture I'm getting because this is all part of a sting happening over one, two, or three days." RP at 527. The court ruled:

> So I feel like on rebuttal after his testimony, this now becomes relevant to the Court and I don't find it's overly prejudicial or a surprise— one, because I've been told that the text messages themselves have already been provided to the Defense in the big packet that they got. And because there isn't separate propensity evidence because it never got to the point where it became overtly sexual in nature—it was a talk.

6

. . . .

So I do feel that's admissible.

RP at 527-28.

However, after further discussion, the parties agreed that Detective Martinez's report and the text messages between Mr. Leonard and the undercover profiles would be admitted in lieu of his testimony. Defense counsel stated, "I would not object to admitting that report, Your Honor. Because I don't see anything harmful in that at all." RP at 528. The court admitted the report and text messages into evidence.

During closing argument, the prosecutor stated that "[t]he State's cell phone expert did testify. He has years of experience and has done hundreds of downloads and he stated he did not recover any messages—any deleted messages from the phone. But he also said that doesn't always happen—he doesn't always get deleted messages." RP at 606. The prosecutor then argued that there were text messages in exhibit 18 that were not found in Mr. Leonard's phone. Exhibit 18 was an "Excel spreadsheet of all the conversations" Mr. Leonard had with Detective Klein who posed as a 13-year-old girl named Crystal. RP at 333. The prosecutor argued this was evidence that Mr. Leonard deleted some of his text messages.

Mr. Leonard was found guilty of attempted rape of a child in the second degree and communicating with a minor for immoral purposes.

At sentencing, defense counsel requested an exceptional downward sentence. Defense counsel requested "the low end of 76.5 months. In terms of years, that would be 6.375 years to life." RP at 655. The court declined to grant an exceptional downward sentence because "[b]ased on everything that I reviewed about this case, I don't find that a mitigating sentence is warranted." RP at 660. Ultimately, the court "impose[d] a 96 month to life sentence on Count 1. That's an even eight years. And 12 months on Count 2" to run concurrently. RP at 661. Additionally, the court ordered a $500 VPA fee, a DNA collection fee, as well as various community custody conditions. Community custody condition 16 ordered, "[t]hat [Mr. Leonard] do not enter a romantic relationship without the prior approval of the [community corrections officer] and Therapist, to ensure that there are no minors at risk." Clerk's Papers (CP) at 292.

Mr. Leonard timely appeals.

ANALYSIS

VICTIM PENALTY ASSESSMENT AND DNA COLLECTION FEE

Mr. Leonard requests that we remand for the trial court to strike the VPA and DNA collection fee. The State concedes.

Former RCW 7.68.035(1)(a) (2018) required a VPA be imposed on any individual found guilty of a crime in superior court. In April 2023, the legislature passed Engrossed Substitute House Bill 1169 (H.B. 1169), 68th Leg., Reg. Sess. (Wash. 2023), that amended RCW 7.68.035 to prohibit the imposition of the VPA on indigent defendants.

8

RCW 7.68.035 (as amended); LAWS OF 2023, ch. 449, § 1. H.B. 1169 took effect on July 1, 2023. Amendments to statutes that impose costs upon convictions apply prospectively to cases pending on appeal. *See State v. Ramirez*, 191 Wn.2d 732, 748-49, 426 P.3d 714 (2018).

Similarly, pursuant to former RCW 43.43.7541 (2018), the trial court was required to impose a $100 DNA collection fee for every sentence imposed for the crimes specified in RCW 43.43.754. Effective July 1, 2023, the legislature amended RCW 43.43.7541 by eliminating language that made the imposition of the DNA collection fee mandatory. *See* LAWS OF 2023, ch. 449, § 4.

Because Mr. Leonard's case is pending on direct appeal, the amendments apply. Further, Mr. Leonard was found to be indigent. Accordingly, we remand for the trial court to strike the VPA and DNA collection fees from Mr. Leonard's judgment and sentence.

COMMUNITY CUSTODY CONDITION 16

Mr. Leonard argues that community custody condition 16 is unconstitutionally vague. The State concedes.

This court has held that the phrase "romantic relationship," as used in a condition of community custody, is unconstitutionally vague. *State v. Peters*, 10 Wn. App. 2d 574, 590-91, 455 P.3d 141 (2019). We have further concluded that amending "'romantic relationship[ ]'" to "'dating relationship'" resolved any vagueness concerns. *Id*.

9

Accordingly, we follow *Peters* and remand for the trial court to replace the word

"romantic" with the word "dating" in community custody condition 16.

STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

RAP 10.10 permits a defendant to file a pro se SAG if he believes his appellate

counsel has not adequately addressed certain matters. Mr. Leonard filed a SAG raising

four issues.

ADDITIONAL GROUND 1

In his first SAG, Mr. Leonard argues that, in violation of *Brady v. Maryland*,[5] the

State introduced evidence at trial that was not disclosed during discovery. He also argues

that the State's use of the evidence violated ER 404(b). We disagree with both

arguments.

In *Brady v. Maryland*, the United States Supreme Court held that "the suppression

by the prosecution of evidence favorable to an accused upon request violates due process

where the evidence is material either to guilt or to punishment, irrespective of the good

faith or bad faith of the prosecution." 373 U.S. at 87. Since *Brady*, the Supreme Court

has held that there is a duty to disclose evidence even in the absence of a request from a

defendant. *United States v. Agurs*, 427 U.S. 97, 107, 96 S. Ct. 2392, 49 L. Ed. 2d 342

(1963). The duty to disclose evidence encompasses impeachment evidence in addition to

---

[5] 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

10

exculpatory evidence. *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L.

Ed. 2d 481 (1985). "The scope of the duty to disclose evidence includes the individual

prosecutor's 'duty to learn of any favorable evidence known to others acting on the

government's behalf . . . including the police.'" *In re Pers. Restraint of Stenson*, 174

Wn.2d 474, 486, 276 P.3d 286 (2012) (quoting *Strickler v. Greene*, 527 U.S. 263, 281,

119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)).

There are three components of a true *Brady* violation: "[(1) t]he evidence at issue

must be favorable to the accused, either because it is exculpatory, or because it is

impeaching; [(2)] that evidence must have been suppressed by the State, either willfully

or inadvertently; [(3)] and prejudice must have ensued." *Strickler*, 527 U.S. at 281-82.

In regard to the third *Brady* factor, "the terms 'material' and 'prejudicial' are used

interchangeably." *Stenson*, 174 Wn.2d at 487 (citing *United States v. Price*, 566 F.3d

900, 911 n.12 (9th Cir. 2009)). If a defendant fails to demonstrate any one of the three

elements, the *Brady* claims fails. *State v. Sublett*, 156 Wn. App. 160, 200-01, 231 P.3d

231 (2010).

The materiality factor under *Brady* is a legal question that is reviewed de novo.

*State v. Davila*, 184 Wn.2d 55, 74, 357 P.3d 636 (2015). The first two *Brady* factors are

factual questions and are analyzed under the substantial evidence standard of review.

*Davila*, 184 Wn.2d at 74. "Substantial evidence exists when the record contains evidence

of sufficient quantity to persuade a fair-minded, rational person that the declared premise

11

is true." *Stenson*, 174 Wn.2d at 488 (internal quotation marks omitted) (quoting *In re*

*Pers. Restraint of Gentry*, 137 Wn.2d 378, 410, 972 P.2d 1250 (1999)). "We defer to the

trial court and will not 'disturb findings of fact supported by substantial evidence even if

there is conflicting evidence.'" *Stenson*, 174 Wn.2d at 488 (quoting *Merriman v.*

*Cokeley*, 168 Wn.2d 627, 631, 230 P.3d 162 (2010)).

Defense counsel moved to exclude a report authored by Detective Martinez,

arguing that the State did not disclose it to defense counsel until after trial commenced.

During argument on the motion, the State explained it previously disclosed the text

messages to the defense and that Detective Martinez's report was written in response to

defense counsel's opening statement. The court agreed, ruling, "the text messages were

provided in advance and the police report was not created [yet] *so it was not withheld.*"

RP at 162 (emphasis added). The court's finding that the report was not withheld is

supported by substantial evidence. Because the evidence was not suppressed by the

State, Mr. Leonard's *Brady* claim fails.

Mr. Leonard next argues that the State's use of the police report and text messages

violated ER 404(b). We disagree.

ER 404(b) states:

> **(b) Other Crimes, Wrongs, or Acts.** Evidence of other crimes,
> wrongs, or acts is not admissible to prove the character of a person in order
> to show action in conformity therewith. It may, however, be admissible for
> other purposes, such as proof of motive, opportunity, intent, preparation,
> plan, knowledge, identity, or absence of mistake or accident.

12

A trial court's decision to admit evidence under ER 404(b) is reviewed for an abuse of discretion. *State v. Fisher*, 165 Wn.2d 727, 750, 202 P.3d 937 (2009). "Discretion is abused if it is exercised on untenable grounds or for untenable reasons." *State v. Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002).

Here, the State sought to have Detective Martinez testify as a rebuttal witness. Detective Martinez was going to testify that Mr. Leonard spoke to three undercover, underage profiles instead of the two undercover profiles as stated in Mr. Leonard's testimony. Defense counsel objected to Detective Martinez's testimony, arguing that the fact that Mr. Leonard spoke to a third undercover profile was "completely irrelevant." RP at 524. The court ruled the evidence was relevant "to tie in to the overall picture I'm getting because this is all part of a sting happening over one, two, or three days." RP at 527. After further discussion, the parties agreed that Detective Martinez's report and the text messages between Mr. Leonard and the undercover profiles would be admitted instead of his testimony. Notably, defense counsel stated, "I would not object to admitting that report, Your Honor. Because I don't see anything harmful in that at all." RP at 528.

First, defense counsel affirmatively stated there was no objection to the admissibility of the report and text messages. Thus, any error is unpreserved. Notwithstanding, the court did not abuse its discretion by admitting the text messages and Detective Martinez's report. As the court noted, the evidence was not being used to show

13

propensity because the texts were not sexual in nature.  Instead, they were relevant and

admissible to rebut Mr. Leonard's assertion that he only spoke to two undercover

personas and to give the court the "overall picture" of Mr. Leonard's involvement during

the ruse.  RP 527.

ADDITIONAL GROUND 2

In his second SAG, Mr. Leonard argues that the State committed misconduct

during closing argument when the prosecutor asserted that Mr. Leonard had deleted text

messages to conceal his true intentions even though there was no evidence that messages

had been deleted.  We disagree.

"Prosecutorial misconduct is grounds for reversal if 'the prosecuting attorney's

conduct was both improper and prejudicial.'"  *State v. Monday*, 171 Wn.2d 667, 675, 257

P.3d 551 (2011) (quoting *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009)).

"[T]he defendant bears the burden of proving that the prosecutor's conduct was both

improper and prejudicial."  *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012).

"A prosecutor's argument must be confined to the law stated in the trial court's

instructions."  *State v. Walker*, 164 Wn. App. 724, 736, 265 P.3d 191 (2011).  "When a

prosecutor mischaracterizes the law and there is a substantial likelihood that the

misstatement affected the jury verdict," the prosecutor's actions are considered improper.

*Id*.

When examining a prosecutor's alleged misconduct, the improper conduct is not viewed in isolation. *Monday*, 171 Wn.2d at 675. Instead, the conduct is looked at "in the full trial context, including the evidence presented, 'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.'" *Id*. (quoting *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006)). The purpose of viewing the conduct in this light is to determine if the prosecutor's conduct was prejudicial to the defendant, and it will only be viewed as prejudicial when there is a substantial likelihood the misconduct affected the jury's verdict. *Id*. Therefore, when viewing misconduct, the court should not focus on what was said or done but rather on the effect that flowed from the misconduct. *Emery*, 174 Wn.2d at 762.

If a defendant fails to object at trial to the prosecutor's alleged misconduct, then "the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Id*. at 760-61 (citing *Stenson*, 132 Wn.2d at 727). "Under this heightened standard, the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id*. at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2012)).

Here, Mr. Leonard points to the prosecutor's statements during closing argument that Mr. Leonard deleted text messages from his phone. Mr. Leonard claims that there was no evidence he deleted any text messages.

Though the State's expert did not directly testify that Mr. Leonard deleted any text messages, the expert did testify that the method he uses to extract text messages from a phone does not always recover deleted messages from every phone. He testified:

> Q And if there were messages on the undercover device that were either sent to or from the device in Exhibit 83 that are now no longer there, what does that mean?
> A It indicates to me that they were deleted.

RP at 426.

During summation, the prosecutor mentioned that the "State's cell phone expert did testify. He has years of experience and has done hundreds of downloads and he stated he did not recover any messages—any deleted messages from the phone. But he also said that doesn't always happen—he doesn't always get deleted messages." RP at 606. The prosecutor then argued that there were text messages in exhibit 18 that were not found in Mr. Leonard's phone. This, the prosecutor argued, was evidence that Mr. Leonard deleted some text messages.

Exhibit 18 was admitted at trial, as was exhibit 83, Mr. Leonard's cell phone. However, no exhibits were designated as a part of the record on appeal. We cannot consider matters outside of the record on appeal. *State v. McFarland*, 127 Wn.2d 322,

335, 899 P.2d 1251 (1995). Because no exhibits were designated, we cannot compare

them to determine whether the prosecutor's assertion, that there were text messages from

the undercover officers' phones that were not recovered from Mr. Leonard's phone, was

correct. Mr. Leonard's recourse is to raise this issue in a personal restraint petition, not in

a SAG. *State v. Alvarado*, 164 Wn.2d 556, 569, 192 P.3d 345 (2008).

ADDITIONAL GROUND 3

In his third SAG, Mr. Leonard contends that his speedy trial right was violated.

We disagree.

This court reviews alleged CrR 3.3 violations de novo. *State v. Kenyon*, 167

Wn.2d 130, 135, 216 P.3d 1024 (2009); *State v. Walker*, 199 Wn.2d 796, 800, 513 P.3d

111 (2022). The decision to grant or deny a continuance is reviewed for an abuse of

discretion. *Kenyon*, 167 Wn.2d at 135.

Under CrR 3.3, Washington's speedy trial rule, a defendant who is detained in jail

must be brought to trial within 60 days of arraignment. CrR 3.3(b)(1)(i), (c)(1).

However, under CrR 3.3(e), certain time periods are excluded for purposes of computing

time for trial. Continuances granted by the court are excluded from the time for trial.

CrR 3.3(e)(3), (f).

The court may grant a continuance on its own motion or the motion of a party

when the administration of justice so requires and the defendant "will not be prejudiced

in the presentation of his or her defense." CrR 3.3(f)(2). "The court must state on the

17

record or in writing the reasons for the continuance." *Id.* "Unavoidable or unforeseen

circumstances affecting the time for trial beyond the control of the court or of the parties"

are also excluded in calculating the time for trial. CrR 3.3(e)(8). If any time period is

excluded under CrR 3.3(e), including for a continuance or unforeseen circumstances, the

allowable time for trial extends to within 30 days after such a period. CrR 3.3(b)(5).

If a defendant is not brought to trial within the applicable time period, the court

must dismiss the charges with prejudice, provided the defendant properly preserves the

issue:

> A party who objects to the date set upon the ground that it is not within the
> time limits prescribed by this rule must, within 10 days after the notice is
> mailed or otherwise given, move that the court set a trial within those time
> limits. Such motion shall be promptly noted for hearing by the moving
> party in accordance with local procedures. A party who fails, for any
> reason, to make such a motion shall lose the right to object that a trial
> commenced on such a date is not within the time limits prescribed by this
> rule.

CrR 3.3(d)(3). A motion objecting to the date set must be made in writing. *See State v.*

*Chavez-Romero*, 170 Wn. App. 568, 581, 285 P.3d 195 (2012), *review denied*, 176

Wn.2d 1023 (2013).

Mr. Leonard was arraigned on September 7, 2022, at which time the court set the

trial deadline for November 7. An omnibus hearing was held on September 27, and then

continued to October 4. At the October 4 hearing, the State contended that a witness was

not available for the current trial date so it requested the trial date be continued to

18

November 16.  The State also suggested the court "set a review hearing hopefully next week" where the State could provide final trial dates.  RP at 18.  Defense counsel objected to continuing the omnibus hearing and requested that the court enter the omnibus order with a trial date of November 16.  The court agreed and scheduled a trial date of November 16 with a trial deadline of December 16.

On November 29, the court heard the State's motion to continue the trial due to witness unavailability.  The court found good cause and continued the trial date to January 25, 2023, with a trial deadline to February 24.  Trial ultimately commenced on February 8.

Here, there was no written motion objecting to the trial date on the ground that it was not within the trial deadline of February 24.  In fact, trial *did* commence within the trial deadline.  Further, at the trial readiness hearing on February 6, it was defense counsel who requested a one-week continuance, though trial ultimately began two days later on February 8.  In any event, because no written motion was brought objecting to the trial date, Mr. Leonard lost the right to object on the basis that trial commenced on a date not within the time limits of CrR 3.3.  CrR 3.3(d)(3).  Thus, Mr. Leonard's argument fails.

ADDITIONAL GROUND 4

In his fourth SAG, Mr. Leonard argues the judge was biased against him because the judge did not grant defense counsel's request for an exceptional downward sentence.

19

Mr. Leonard contends there are cases similar to his in which the court imposed exceptional downward sentences. We disagree.

"Generally, a criminal defendant is permitted to appeal a standard range sentence only if the sentencing court fails to follow a required procedure." *State v. M.L.*, 114 Wn. App. 358, 361, 57 P.3d 644 (2002). Mr. Leonard seems to argue that the court was biased against him, but does not point to any specific procedure not followed.

"Due process, the appearance of fairness doctrine and Canon [2.11] of the Code of Judicial Conduct . . . require a judge to disqualify himself if he is biased against a party or his impartiality may reasonably be questioned." *State v. Dominguez*, 81 Wn. App. 325, 328, 914 P.2d 141 (1996). However, there is a presumption that a judge performs his or her functions regularly and properly without bias or prejudice. *Kay Corp. v. Anderson*, 72 Wn.2d 879, 885, 436 P.2d 459 (1967); *Jones v. Halvorson-Berg*, 69 Wn. App. 117, 127, 847 P.2d 945 (1993). Thus, a party seeking to overcome that presumption must offer some kind of evidence of a judge's actual or potential bias. *Wolfkill Feed & Fertilizer Corp. v. Martin*, 103 Wn. App. 836, 841, 14 P.3d 877 (2000); *Dominguez*, 81 Wn. App. at 329.

Mr. Leonard does not point to anything in the record or offer any evidence indicating that the judge was biased against him. Consequently, his claim fails.

20

CONCLUSION

We affirm Mr. Leonard's convictions and remand for the limited purposes of striking the VPA and DNA collection fee from the judgment and sentence and to modify community custody condition 16 to replace the word "romantic" with the word "dating."

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

WE CONCUR:

_____    _____
Fearing, J.                                             Staab, A.C.J.