IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION II

| | |
|---|---|
| In the Matter of the Personal Restraint Petition of: | No. 42012-1-II |
| LESTER JUAN GRIFFIN, | UNPUBLISHED OPINION |
| Petitioner. | |

LEE, J. — Lester Juan Griffin was convicted of first degree burglary and first degree assault in 2009. This court affirmed his convictions on direct appeal in 2010[1] and then dismissed his personal restraint petition on procedural grounds in 2014.[2] The Supreme Court remanded Griffin's petition for determination on its merits.[3]

In his petition, Griffin raises three broad arguments. First, he asserts that his rights under *Brady v. Maryland*[4] were violated when his defense counsel did not receive evidence relating to investigations against the lead investigating officer for: (1) conflicting statements made under oath in a different criminal proceeding; (2) sexual harassment and assault of a coworker; and (3) an off-duty, unauthorized investigation and arrest of a suspect. Second, he asserts that his trial counsel

---

[1] *State v. Griffin*, noted at 157 Wn. App. 1001 (2010).

[2] *State v. Griffin*, 181 Wn. App. 99, 325 P.3d 322 (2014).

[3] *State v. Griffin*, 182 Wn.2d 1022, 349 P.3d 819 (2015).

[4] 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

was ineffective for failing to: (1) adequately investigate the officer's conduct described above; (2) impeach the testimony of the accomplice and investigating officer with a prior inconsistent statement; and (3) object to the prosecutor's conduct during the State's case in chief, closing, and rebuttal. Third, Griffin asserts that several instance of prosecutorial misconduct warrant reversal of his convictions.

We grant Griffin's petition and remand for new trial because the State failed to disclose evidence favorable to Griffin that, in the aggregate, create a reasonable probability that the outcome of the proceedings would have been different. We also hold that Griffin's counsel was deficient in failing to object to the prosecutor's improper vouching during the State's case in chief and there is a reasonable probability that prejudice resulted. Finally, we dismiss Griffin's prosecutorial misconduct argument because he fails to establish that a curative instruction could not have obviated the prejudice.

FACTS

Lester Juan Griffin was convicted in 2009 of attempted first degree burglary, with a firearm enhancement, and first degree assault, with a firearm enhancement. His convictions precipitated from the attempted robbery, and subsequent shooting, of Gary Atkinson around midnight on May 17, 2008.

A.    THE CRIME

Around midnight on May 17, 2008, Atkinson awoke to a loud pounding on the front door of his apartment. He opened his front door partway and saw two African-American males standing outside his door. The men wore bandanas covering their mouths, but not their noses, and both had guns pointed at him. The men shouted for Atkinson to "[g]et down," as Atkinson tried to shut the

door on them. Verbatim Report of Proceedings (VRP) at 100. Unable to shut the door, Atkinson allowed the door to swing open and pushed his way through the two men. Outside of his apartment, Atkinson heard one say, "We'll shoot. We'll shoot." VRP at 101, 106, 123. He heard two shots, and felt one of the bullets hit him in the back.

Atkinson ran to his neighbor's apartment for help. Atkinson's neighbor had heard the gunshots and, after Atkinson came inside, stepped outside to see two men running down the hallway towards the carport area. The neighbor then called 911. The first 911 call came in at 12:12 a.m. on May 17.

Atkinson said he recognized one of his attackers as Garry Alexander. Atkinson said he recognized Alexander by his voice, build, eyes, nose, and tattoo under his eye. Atkinson told the responding officer that Alexander was one of his attackers, and he identified Alexander in a photo laydown[5] later at the hospital. Atkinson testified that he knew Alexander through Atkinson's girlfriend, whom Alexander had a child with. Atkinson said that he and Alexander had spoken more than twenty times over the prior two years, that Alexander had been to Atkinson's home and work, and that Alexander had a "distinctive" voice. VRP at 117. Atkinson also said that his girlfriend had told him that Alexander was planning to punch Atkinson in the stomach the next time Alexander saw him.[6]

---

[5] At a photo laydown, a witness is presented with several pictures of different people for the purpose of potentially identifying the individual who committed the witnessed act.

[6] This threat is significant to Atkinson because he had had six stomach surgeries.

B.      PRE-TRIAL INVESTIGATION

Alexander was arrested later in the day on May 17. He was interviewed on May 18 and May 19 by lead investigator Officer Jeffrey Wilken, of the Vancouver Police Department. In the first interview, Alexander denied involvement in the crime. In the second interview, Alexander confessed to his involvement, but named Griffin and Christopher Perkins as the two men who showed up at Atkinson's front door. In the second interview, Alexander described the events leading up to the attempted robbery as follows

> [Wilken]:     And what did those two [Griffin and Perkins] do?
>
> [Alexander]:  Um, they (unintelligible) and then they came back and I walked . . . I wanted something to drink so I walked to Chevron.
>
> [Wilken]:     Okay.
>
> [Alexander]:  Got something to drink. Well, actually, went to (unintelligible) and then left and went back, you know, (unintelligible). They got in the car, (unintelligible) I mean, I didn't think, you know what I'm saying, that they was going to go . . . go over there for real.

Personal Restraint Petition (PRP)[7] Ex. 16, at 44. Alexander told Wilken the three then went to the Evergreen Park Apartments, near Atkinson's apartment complex, and parked there. PRP Ex. 16, pg. 46. Alexander said he was supposed to be the getaway driver, but had thought better of it and left Griffin and Perkins stranded at the apartments after they got out of the car.

Perkins was picked up by police and went with Sergeant Michael Chylack and another officer as they searched the area around the Evergreen Park Apartments during the day on May

---

[7] There were several briefs filed in support of Griffin's petition, the procedural propriety of which is not before this court. When citing to the "PRP" in this opinion, we are referring to the brief entitled "Opening Brief in Support of Amended Personal Restraint Petition."

19. The officers had to abandon their search, however, because they were afraid Perkins would be seen working with the police. Perkins told the police where to find a glove that was used in the crime. Chylack returned that night, this time with Wilken, and Chylack found a black glove along a fence line. A deoxyribonucleic acid (DNA) analysis was performed on the glove. Griffin's DNA was found on the glove, along with other unknown contributors, while Alexander and Perkins were excluded as possible contributors.

After Alexander's second interview, Alexander entered into a plea deal with the State in exchange for his testimony against Griffin. The plea agreement stated that Alexander would be given a sentence of 48 months for first degree attempted robbery in exchange for his truthful testimony against Griffin and Perkins. The plea agreement also stated that Alexander would be subject to a polygraph test at any time. The plea agreement was later admitted at trial without objection from Griffin's trial counsel.

C.      TRIAL TESTIMONY

Alexander testified that on the night of the attempted robbery, he and Perkins were at Griffin's apartment when Alexander and Perkins decided to walk to a nearby Chevron convenience store for snacks. The convenience store did not take EBT cards as a form of payment, so Alexander and Perkins walked to the mini-mart across the street. Griffin met them on the way to the mini-mart. The three were captured on the mini-mart's surveillance system entering at 11:39 p.m. and leaving at 11:41 p.m. on May 16. After leaving the mini-mart the three went back to Griffin's apartment, got into Griffin's car, and then the three drove back to the mini-mart in Griffin's car where Griffin bought a Steel Reserve beer. Security footage from the mini-mart shows Griffin

arriving at 11:54 p.m. and leaving with a silver aluminum can at 11:58 p.m. on May 16. Only Griffin could be seen in the later photos from the mini-mart.

Alexander also testified that after leaving the mini-mart, they parked at the Evergreen Park Apartments because it was further away from where the robbery would take place, and then Griffin and Perkins got out to go rob Atkinson. Alexander "lost his nerve" and drove to the apartment of his ex-wife, Tina Williams, so he could use her phone to call his fiancée. VPR at 264. He said he wanted his fiancée to help him get Griffin's car back to Griffin's apartment.

Marilyn Green was Griffin's friend and lived in the Evergreen Park Apartments. She testified that Griffin and another African-American male arrived at her doorstep about 11:00 p.m., or a little bit after, asking to use her phone. She could not remember on what day this occurred. Griffin told her they had been drinking at a bar, Griffin's car had broken down, and they needed to call for a ride. This testimony was confirmed by Green's daughter, who also testified at Griffin's trial.

Wilken also testified at Griffin's trial. He testified that Alexander's testimony at trial was consistent with what Alexander had told him during the second interview, before Alexander had been offered a plea deal. Specifically, Wilken testified that Alexander had told him they made a second stop at the mini-mart so that Griffin could buy a Steel Reserve beer. This testimony was admitted over objection as a prior consistent statement because, as the prosecutor argued to the judge, "This witness [Wilken] would testify that Garry Alexander told him the exact same thing in the interview that was before the cooperation agreement was signed, so I submit it's not hearsay, it's a prior consistent statement." VRP at 399.

6

D.    *BRADY* REQUEST

Shortly before trial, the defense learned that Wilken was placed on administrative leave

from the Vancouver Police Department.  Griffin's trial counsel brought this to the trial court's

attention and asked for the facts related to the administrative leave to determine if they went to the

"truth and veracity, which could have an effect . . . in this case."  VRP at 87.  The prosecutor

responded that he did not know how the defense found out that Wilken was on administrative

leave, but that he had "looked into it to find out if there was any Brady material," and that he was

"specifically advised by the chief criminal deputy" "that there was no allegation of any issues that

would go to Wilken's truth or veracity and directed me not to disclose the fact that he's on

administrative leave to the [d]efense."  VRP at 88.  The trial court reserved ruling until after the

prosecutor had a chance to confer further with the chief deputy.

Partway through the trial, the chief deputy prosecutor gave the court a "file relating to Jeff

Wilken."  VRP at 180.  The trial court accepted the file under seal for an in-camera review of its

contents.  After reviewing the file, the trial court found:

> I have reviewed the materials related to Officer Wilken's suspension or
> administrative leave.  It's the Court's opinion after that review that the documents
> do not contain admissible evidence in these proceedings either for substantive or
> for impeachment purposes; therefore, the motion to disclose is denied.

VRP at 303.

E.    WILKEN'S CONDUCT

1.    Internal Affairs Investigation - IA #00-38

The petition identifies three different formal complaints and subsequent internal

investigations into Wilken's prior conduct that Griffin claims should have been disclosed for his

defense. First, Griffin cites to IA #00-38, which was filed by the Clark County Prosecutor's Office. The complaint alleged that Wilken "provided testimony in court that was in conflict with a search warrant affidavit he authored as well as an Order for Destruction of Hazardous Substances." PRP at Ex. 2. After an internal investigation into the complaint was conducted, the Vancouver Police Department concluded:

> [T]here appears to be sufficient evidence that you [Wilken] provided testimony on several occasions that contradicted other testimony provided by you in this criminal case. Specifically, you provided testimony via several written documents authored by you (e.g., police reports, affidavit for search warrant, and Order for Destruction of Hazardous Substances) and during the course of a pre-trial conference and a Suppression Hearing in Clark County Superior Court. Review of each of these documents, your statements during the pre-trial conference and testimony during the Suppression Hearing revealed several inconsistencies in your testimony. The allegation that you violated Vancouver Police Department Policy 7.13.18 Statements/False Statements is **not sustained**. The allegation that you violated Vancouver Police Department Policy 5.1 Neglect of Duty is **sustained**. The allegation that you violated Vancouver Police Department Policy 5.2 Incompetence is **sustained**.

PRP Ex. 1.

2.     Sexual Harassment and Assault Allegations

Second, Griffin cites to sexual harassment and assault allegations against Wilken for conduct towards a female community corrections officer that was pending at the time of Griffin's trial. Tanis Conroy was the community corrections officer, and she was assigned to work on a Neighborhood Response Team with Wilken. The complaint alleged several instances of inappropriate conduct by Wilken including placing a pair of women's underwear on Conroy's head during the execution of a search warrant, handcuffing her to a chair and wheeling her into the men's locker room, and making sexual remarks towards her.

The Clark County Sheriff's Office and the Prosecuting Attorney's Office investigated the matter, and Wilken was placed on administrative leave during the investigation. As part of the investigation, Wilken was interviewed by the sheriff's office. During that interview, Wilken made the following statement as to why he believed Conroy had initiated the complaint:

> My belief is Tanis got herself in a jam at McNicholas's party with Acee. They're [Tanis and her fiancé, Gordon, another police officer] two weeks from getting married. The car being—the seat being forward. The—I think there was issues going on between her and Gordon. They're a couple weeks from getting married.
>
> Then the handcuffing thing happens, she called, she goes home, and in that week time period, it's, as I said, I don't know Gordon from anybody. There are cops that I work with that couldn't figure their way out of, out of a room. They don't know how to ask someone basic questions. Then there are cops, and I ain't blowing my own horn, that are as good as me that can sit in a room and get someone that didn't do it to say they did it.
>
> And my belief is I give Gordon any credit at all, is he had a conversation which was probably a long drawn-out one with her, like "What the [expletive] is going on? You have this, you have this, you have this. You told me he handcuffed you. What other [expletive] has he done? . . ."
>
> . . . .
>
> That's the reason why she's crying to people. That's the reason why she's all freaked out. Because I think it was a choice. It was my new husband or it was my reputation. And it was her husband. . . .

PRP Ex. 12, at 66. After reviewing the evidence, the prosecutor's office decided not to bring charges against Wilken.

3.     Internal Affairs Investigation - IA #02-33

Third, Griffin cites to IA #02-33, where the Vancouver Police Department investigated Wilken for apprehending a suspect without authorization, and while off-duty with his kids. IA #02-33 involved a situation where Wilken was off-duty and received a tip on where a suspect could

be found. Wilken proceeded, without authorization, in his personal vehicle with his minor children present, to the identified location where he found the suspect. Wilken then arrested the suspect and placed her in the back of a marked police car that had arrived. After placing the suspect in the police car, Wilken removed the suspect's handcuffs and left the back windows of the police car rolled down. The suspect escaped, resulting in a footrace to re-apprehend the suspect. Based on the investigation, the Vancouver Police Department found Wilken violated the Department's policies of "Neglect of Duty," "Duty to Report Information," "Unauthorized Investigations," "Chain of Command," and "Prisoner Security"; and "[s]ufficient evidence exists to substantiate the allegation that [Wilken] failed to exercise diligence, good judgment, and the interest of the Department." PRP Ex. 3. In the letter of reprimand to Wilken, the chief of police also noted:

> First, you failed to meet reasonable expectations of performance while handling a case of this nature. Second, there is a sufficient history of internal affairs investigations with you as the subject of the investigation, three of which resulted in sustained policy violations for incidents in which you also failed to exercise good judgment in your duties as a police officer. Third, you have already received counseling and retraining for previous performance errors. Fourth your actions placed you and a probationary officer in a potentially harmful situation given the lack of resources available at the time you took this unauthorized action. . . . The totality of your actions in response to this situation reveal both neglect and disregard for departmental rules and regulations.

PRP Ex. 3, Letter of Reprimand at 2.

F.     PROCEDURAL POSTURE

In his direct appeal to this court, Griffin argued that his constitutional rights to a speedy trial, to present a defense, to effective assistance of counsel, and to be protected against double jeopardy were violated. *State v. Griffin*, noted at 157 Wn. App. 1001 (2010). This court disagreed and affirmed his convictions in an unpublished opinion. *Id.* Now, Griffin argues in his personal

restraint petition that he is entitled to relief for the State's *Brady* violations, receiving ineffective

assistance of counsel, and being subject to prosecutorial misconduct.

ANALYSIS

A.    PERSONAL RESTRAINT PETITION

When considering a personal restraint petition, a court may grant relief to a petitioner only

if the petitioner is under an unlawful restraint, as defined by RAP 16.4(c).  *In re Pers. Restraint of*

*Yates*, 177 Wn.2d 1, 16, 296 P.3d 872 (2013).  The collateral relief afforded under a personal

restraint petition is limited, and requires the petitioner to show that he was prejudiced by the

alleged error of the trial court.  *In re Pers. Restraint of Hagler*, 97 Wn.2d 818, 819, 650 P.2d 1103

(1982).  There is no presumption of prejudice on collateral review.  *Id.* at 823.  The petition does

not serve as a substitute for appeal; nor can the petition renew an issue that was raised and rejected

on appeal, unless the interests of justice so require.[8]  *In re Pers. Restraint of Davis*, 152 Wn.2d

647, 671, 101 P.3d 1 (2004).

The petitioner must either make a prima facie showing of a constitutional error that, more

likely than not, constitutes actual and substantial prejudice, or a nonconstitutional error that

inherently constitutes a complete miscarriage of justice.  *In re Pers. Restraint of Stockwell*, 161

---

[8] In his direct appeal, Griffin argued that he received ineffective assistance because he had a conflict of interest with his defense counsel due to the fact that Griffin had filed a bar complaint against the defense counsel.  *Griffin*, noted at 157 Wn. App. 1001.  Here, Griffin raises different reasons for receiving ineffective assistance, one of which we hold warrants reversal.  Because we may hear issues that have already been raised where the interests of justice so require, and one of the issues already raised warrants reversal, we allow the issue.  *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 671, 101 P.3d 1 (2004); *see also In re Pers. Restraint of Percer*, 150 Wn.2d 41, 47, 75 P.3d 488 (2003) (holding that the court of appeals can properly review in a PRP the identical double jeopardy issue rejected on direct appeal).

Wn. App. 329, 334, 254 P.3d 899 (2011), *aff'd*, 179 Wn.2d 588, 316 P.3d 1007 (2014); *Hagler*, 97 Wn.2d at 826; *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 810, 812, 814, 792 P.2d 506 (1990). Without either such showing, we must dismiss the petition. *Cook*, 114 Wn.2d at 810, 812; *see also In re Pers. Restraint of Hews*, 99 Wn.2d 80, 88, 660 P.2d 263 (1983). However, with respect to claims of *Brady* violations or ineffective assistance of counsel, the prejudice element of a petition is established by showing "a reasonable probability that the outcome of the proceedings would have been different" absent the *Brady* violation or ineffective assistance of counsel. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 845, 280 P.3d 1102 (2012).

The petitioner's allegations of prejudice must present specific evidentiary support. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086, *cert. denied*, 506 U.S. 958 (1992). Such support may come from the trial court record. "If the petitioner's allegations are based on matters outside the existing record, the petitioner must demonstrate that he has competent, admissible evidence to establish the facts that entitle him to relief," which may include affidavits or other corroborative evidence. *Id.* Bald assertions and conclusory allegations are insufficient support. *Id.* If a petitioner makes a prima facie showing of prejudice, but the merits of his assertions cannot be determined on the record, we will remand for a hearing pursuant to RAP 16.11(a) and RAP 16.12. *Hews*, 99 Wn.2d at 88.

B.      *BRADY* VIOLATION

Griffin first argues his due process rights were violated under *Brady v. Maryland*, 373 U.S. 83, and its progeny of cases. Griffin asserts that, under *Brady*, the State violated its duty to disclose evidence favorable to the accused by failing to turn over four types of evidence that would impeach the testimony of Wilken. The first involved the complaint, IA #00-38, to the Clark County

prosecutor's office regarding Wilken's conflicting statements in a search warrant application, an order for destruction, and his testimony at a suppression hearing. The second was the investigative report following the claims of Wilken's sexual harassment and assault of Tanis Conroy. The third involved the complaint, IA #02-33, that Wilken attempted to investigate and arrest a suspect while off-duty.[9] We hold that there is a reasonable probability that the outcome of Griffin's trial would have been different had evidence relating to IA #00-38, the sexual harassment and assault allegations, and IA #02-33 been disclosed to the defense.

### 1. Legal Principles

To establish a *Brady* violation, the petitioner must demonstrate the existence of each of three necessary elements: first, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;" second, "that evidence must have been suppressed by the State, either willfully or inadvertently;" and third, "prejudice must have ensued" such that there is a reasonable probability that the result of the proceeding would have differed had the prosecution disclosed the evidence to trial counsel. *Strickler v. Greene*, 527 U.S. 263, 281-82, 289, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). If a defendant fails to demonstrate any of the three elements, his *Brady* claim fails. *Id.*; *State v. Sublett*, 156 Wn. App. 160, 199-201, 231 P.3d 231 (2010), *aff'd*, 176 Wn.2d 58, 292 P.3d 715 (2012).

---

[9] Griffin also asserted a fourth basis: an e-mail from the Clark County prosecutor's office complaining that Wilken was interfering in plea negotiations with one of his confidential informants who had been caught shoplifting. This fourth basis is not included in the body of this opinion because Griffin only raises it in a footnote with no supporting argument. Therefore, we do not consider this assertion. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

Favorable evidence must be disclosed to the accused "'where the evidence is material either to guilt or to punishment,'" regardless of whether the accused requests such evidence. *In re Pers. Restraint of Stenson*, 174 Wn.2d 474, 486, 276 P.3d 286 (quoting *Brady*, 373 U.S. at 87), *cert. denied*, 1335 S. Ct. 444 (2012). Favorable evidence "encompasses impeachment evidence as well as exculpatory evidence." *Stenson*, 174 Wn.2d at 486; *see United States v. Price*, 566 F.3d 900, 907 (9th Cir. 2009) ("evidence that would impeach a central prosecution witness is indisputably favorable to the accused."); *see also United States v. Blanco*, 392 F.3d 382, 387 (9th Cir. 2004) ("*Brady/Giglio* information includes 'material . . . that bears on the credibility of a significant witness in the case.'") (alteration in original) (quoting *United States v. Brumel-Alvarez*, 991 F.2d 1452, 1461 (9th Cir. 1993)). Evidence need not be admissible to be subject to disclosure under *Brady*. *Price*, 566 F.3d at 912.

Suppression occurs when the government withholds material evidence favorable to the accused, "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87; *Stenson*, 174 Wn.2d at 486. "[S]uppressed evidence [is] considered collectively, not item by item." *Kyles v. Whitley*, 514 U.S. 419, 436, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). The scope of the government's "duty to disclose evidence includes the individual prosecutor's 'duty to learn of any favorable evidence known to the others acting on the government's behalf . . . including the police.'" *Stenson*, 174 Wn.2d at 486 (quoting *Strickler*, 527 U.S. at 281).

Prejudice is shown when the "admission of the suppressed evidence would have created a 'reasonable probability of a different result.'" *Price*, 566 F.3d at 911 (quoting *United States v. Jernigan*, 493 F.3d 1050, 1053 (9th Cir. 2007)); *In re Pers. Restraint of Woods*, 154 Wn.2d 400, 428, 114 P.3d 607 (2005) (stating that evidence is material and "must be disclosed if there is a

reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different."). "[R]easonable probability" is defined as "'a probability sufficient to undermine confidence in the outcome.'" *Price*, 566 F.3d at 911 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985)). Whether our confidence in the outcome is undermined requires us to weigh the withheld evidence "'in the context of the entire record.'" *Price*, 566 F.3d at 913 (quoting *Jernigan*, 492 F.3d at 1053). Because we consider the prejudicial effect of all suppressed evidence favorable to the defendant, this opinion discusses the favorable and suppressed nature of each evidentiary item raised by Griffin, and then addresses the aggregate prejudice of the favorable and suppressed evidence.

2.      IA #00-38

Griffin first asserts that the State violated its duty to disclose favorable evidence by failing to turn over evidence relating to Wilken's conflicting statements in a search warrant application, an order for destruction, and his testimony at a suppression hearing. IA #00-38 resulted from a complaint from the Clark County Prosecutor's office alleging that Wilken "provided materially false statements under oath in Clark County Superior Court" and "[d]uring the course of the review of this incident additional potential policy violations were noted." PRP Ex. 1. We hold the evidence was both favorable to Griffin and suppressed by the State.

a.      "Favorable to the Accused"

IA #00-38 identified specific instances where Wilken provided contradictory and inconsistent statements under oath to the superior court regarding a criminal case. IA #00-38 concluded that Wilken did provide contradictory and inconsistent statements and that he had

violated Vancouver Police Department Policy 5.1 Neglect of Duty and Vancouver Police Department Policy 5.2 Incompetence.

Here, the suppressed evidence was favorable and material because it could have been used to impeach Wilken's testimony. ER 608(b) allows, at the trial court's discretion, cross-examination of specific instances of a witness's conduct for purposes of impeaching the witness's character for truthfulness or untruthfulness. Wilken was the lead investigating officer and was the officer who conducted the interviews of Alexander. Alexander's testimony was the only evidence that identified Griffin as committing the illegal acts for which Griffin was convicted, and Alexander provided that testimony in return for a significant reduction in his own sentence. The prosecutor acknowledged to the trial court that Wilken's testimony was offered to rehabilitate Alexander's earlier testimony to the jury by showing that Alexander's prior statements to Wilken were consistent. Wilken's testimony rehabilitating Alexander's testimony was significant, if not central, to the State's case against Griffin. *Price*, 566 F.3d at 907 ("evidence that would impeach a central prosecution witness is indisputably favorable to the accused."), 912 (("'evidence is material if it might have been used to impeach a government witness.'") (quoting *Paradis v. Arave*, 240 F.3d 1169, 1179 (9th Cir. 2001)); *see also Blanco*, 392 F.3d at 387 ("*Brady* . . . information includes 'material . . . that bears on the credibility of a significant witness in the case.'"). Therefore, the evidence from IA #00-38 was favorable to Griffin, and the first element of a *Brady* violation for the nondisclosure of evidence relating to IA #00-38 is met.

b.      "Suppressed by the State"

There is no dispute that evidence relating to IA #00-38 was not turned over to the defense.[10] The reasons for the State's failure to disclose evidence relating to IA #00-38 is immaterial, and the withholding is determinative.  *Brady*, 373 U.S. at 87; *Stenson*, 174 Wn.2d at 486.   Evidence relating to IA #00-38 was suppressed by the State, and the second element of a *Brady* violation for the nondisclosure of evidence relating to IA #00-38 is met.

3.      Sexual Harassment and Assault Allegations

Griffin next asserts the State violated its duty under *Brady* by failing to disclose the criminal investigation involving Wilken.  Griffin argues that the State wrongfully suppressed three pieces of evidence relating to the criminal investigation into sexual harassment and assault allegations against Wilken: the first was Wilken's placing a pair of women's underwear on Tanis Conroy's head during the execution of a search warrant; the second was the potential criminal investigation against Wilken for the entirety of his conduct towards Conroy; and the third was the transcript of Wilken's interview with the sheriff's office regarding his interactions with Conroy. We hold that evidence of the criminal investigation against Wilken was favorable to Griffin and should have been disclosed to the defense.

---

[10] There is nothing in the record or in the State's briefing to suggest evidence relating to IA #00-38 was turned over for the trial court's review.  The State's silence on this point supports the conclusion that the evidence relating to IA #00-38 was not disclosed.

a.     "Favorable to the Accused"

(i)     Conduct during Search Warrant

First, Griffin contends that the evidence of Wilken's placing a pair of women's underwear on Conroy's head during the execution of a search warrant is favorable because it "show[s] Officer Wilken's disregard for the proper handling of evidence." Pet'r's Reply to State's July 29, 2013 Response at 11. Griffin's argument on this point fails, however, because nothing in the record indicates there was any mishandling of evidence. The record shows the incident occurred after the search party had found no evidence of drugs, and was exiting the room when Wilken took the underwear off a clothes pile or drawer and placed them on Conroy's head, who was walking in front of him. The officer assigned to evidence collection on that search warrant was not concerned with Wilken's conduct from an evidence collection standpoint. Griffin fails to establish how Wilkin's conduct is material to Griffin's guilt or punishment, or how it could impeach Wilken's credibility or lead to impeachment evidence.

(ii)     Criminal Investigation

Second, Griffin contends that the evidence of a potential criminal investigation against Wilken based on his conduct towards Conroy is favorable because it indicates a potential bias in Wilken's testimony, despite the prosecutor's office decision not to file charges. The defense is allowed to show on cross-examination that the witness has a motivation to present testimony consistent with the State's theory of the case. *Davis v. Alaska*, 415 U.S. 308, 311, 317-18, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974). As Griffin points out, the prosecutor's office's decision not to press charges does not prohibit the State from instituting charges in the future. Thus, evidence of

18

a potential criminal investigation against Wilken was evidence bearing on his credibility and impeaching. The evidence was favorable to Griffin.

(iii)     Wilken's Statement

Third, Griffin contends that Wilken's statement to the sheriff's department regarding his interactions with Conroy is favorable to Griffin because it shows Wilken's "admitted disregard for an honest investigative outcome." PRP at 18. The allegedly damning portion of Wilken's statement is, "there are cops, and I ain't blowing my own horn, that are as good as me that can sit in a room and get someone that didn't do it to say that they did it." PRP Ex. 12, at 66. Wilken's statement discussed how Conroy's fiancé, who was also a police officer, might have questioned Conroy about her potential infidelity. But, in the statement, Wilken never insinuates that he has obtained, or would ever try to obtain, a false confession. Thus, this evidence would not be of any impeachment value to Griffin, and Griffin fails to establish how this evidence could lead to the discovery of any other impeachment evidence.

b.     "Suppressed by the State"

(i)     Conduct During Search Warrant

We do not reach the issue of whether the evidence of Wilken's placing a pair of women's underwear on Conroy's head during the execution of a search warrant was suppressed by the State because that evidence is not favorable to Griffin. *See e.g.*, *Strickler*, 527 U.S. at 281-82 (failing to establish any element of a *Brady* violation causes the claim to fail).

(ii)     Criminal Investigation

The evidence of a potential criminal investigation against Wilken for his conduct towards Conroy was not provided to the defense. And although the evidence was provided to the trial

court,[11] the State's good faith withholding of evidence is immaterial for the purposes of analyzing

*Brady* violations. *See e.g.*, *Price*, 566 F.3d at 907-08 ("We perform th[e suppression] step of the

inquiry 'irrespective of the good faith or bad faith of the prosecution.'") (quoting *Brady*, 373 U.S.

at 87). Thus, the evidence of a potential criminal investigation against Wilken for his conduct

towards Conroy was suppressed by the State.

(iii)    Wilken's Statement

We do not reach the issue of whether Wilken's statement to the sheriff's department

regarding his interactions with Conroy was suppressed because the evidence was not favorable to

Griffin. *See e.g.*, *Strickler*, 527 U.S. at 281-82 (failing to establish any element of a *Brady* violation

causes the claim to fail).

4.    IA #02-33

Griffin also asserts the State violated its duty under *Brady* by failing to turn over evidence

related to Wilken's off-duty, unauthorized investigation and arrest of a suspect in 2002. Griffin

asserts that this evidence was favorable to him because it would have bolstered his argument that

Wilken's finding of the glove with Griffin's DNA on it was not credible based on Wilken's

---

[11] The State argues that giving the file to the trial court for in-camera review constitutes disclosure to satisfy *Brady*. In support, the State cites cases analyzing discovery requests under an abuse of discretion standard. The State's position is incorrect because the prosecution is required to make *Brady* disclosures, regardless of whether the defense makes a discovery request. *See United States v. Kennedy*, 890 F.2d at 1056, 1058 (1989) ("The *Brady* doctrine has been expanded to include cases where the defendant has not requested the relevant material."), *cert. denied*, 494 U.S. 1008 (1990); *see also State v. Knutson*, 121 Wn.2d 766, 771-72, 854 P.2d 617 (1993). Moreover, a violation of the *Brady* doctrine violates a defendant's constitutional right to due process. *Brady*, 373 U.S. at 87. Such constitutional questions are reviewed for constitutional error, not for an abuse of the trial court's discretion. *See Kyles*, 514 U.S. at 435.

"pattern of running afoul of police department polices." PRP at 17. The State does not appear to dispute that this evidence was favorable to Griffin nor does the State contend that evidence relating to IA #02-33 was disclosed to the defense.[12]

> a.    "Favorable to the Accused"

The evidence in IA #02-33 is favorable to Griffin because it could arguably be used to impeach Wilken on his investigation into this case. The conclusions reached in IA #02-33 were that Wilken had violated the Vancouver Police Department's policies of "Neglect of Duty," "Duty to Report Information," "Unauthorized Investigations," "Chain of Command," and "Prisoner Security"; and "[s]ufficient evidence exists to substantiate the allegation that [Wilken] failed to exercise diligence, good judgment, and the interest of the Department." PRP Ex. 3. This evidence would be favorable to Griffin in arguing to the jury that the integrity of Wilken's investigation of the crime Griffin was charged with could be doubted.

More importantly, however, this evidence could also lead to finding that other investigations into Wilken's conduct as an officer have been conducted improperly. In the Letter of Reprimand to Wilken for IA #02-33, the chief of police said:

> Second, there is a sufficient history of internal affairs investigations with you as the subject of the investigation, three of which resulted in sustained policy violations for incidents in which you also failed to exercise good judgment in your duties as a police officer. Third, you have already received counseling and retraining for previous performance errors.

---

[12] Instead, the State only argues that "[i]t is difficult to imagine how these acts of misconduct . . . would be admissible in Griffin's" case. Response to PRP at 31. The admissibility of the evidence is properly addressed in determining whether the evidence would affect the outcome of the proceeding, not in determining whether the evidence is favorable to the defendant or whether the evidence was suppressed. *State v. Gregory*, 158 Wn.2d 759, 797, 147 P.3d 1201 (2006); *Knutson*, 121 Wn.2d at 772-73.

PRP Ex. 3, Letter of Reprimand at 2. This would have led Griffin or Griffin's attorneys to ask about Wilken's "history of internal affairs investigations," such as IA #00-38, which would be admissible to impeach Wilken's testimony. PRP Ex. 3, Letter of Reprimand at 2. Thus, Griffin satisfies the first element of a *Brady* violation by showing that the evidence from IA #02-33 was favorable.

    b.  "Suppressed by the State"

There is nothing in the record, nor in the State's briefing, that suggests evidence relating to IA #02-33 was turned over to the defense. Therefore, the State suppressed evidence relating to IA #02-33, and the second element of a *Brady* violation for the nondisclosure of evidence relating to IA #02-33 is met.[13]

  5.  Prejudice

The evidence Griffin has identified that is both favorable to him and was suppressed by the State is evidence relating to: (1) IA #00-38; (2) the potential criminal investigation against Wilken for his conduct towards Conroy; and (3) IA #02-33. We consider the prejudicial effect of this evidence collectively and in the context of the entire record. *Price*, 566 F.3d at 913.

The favorable evidence that the State failed to disclose to Griffin was both likely admissible and likely to lead to other evidence that could be admissible to impeach Wilken. First, evidence

---

[13] Griffin also asserts, in a footnote, that but for Wilken's resignation, another internal investigation would have been launched into Wilken's alleged interference with the plea negotiations between the prosecutor's office and a confidential informant. Griffin does not provide any further argument or discussion relating to Wilken's alleged interference. Consequently, we do not consider this argument. RAP 10.3(a)(6); *Cowiche Canyon Conservancy*, 118 Wn.2d at 809.

relating to IA #00-38 was likely admissible under ER 608(b) to show a specific instance where Wilken gave inconsistent statements under oath in a criminal proceeding. Second, evidence of a potential criminal investigation against Wilken for his conduct towards Conroy would likely be admissible to show Wilken had motivation to present testimony consistent with the State's theory of the case. *Davis*, 415 U.S. at 311, 317-18. Third, evidence relating to IA #02-33 could have exposed other admissible impeachment evidence, such as the existence previous internal investigations like IA #00-38.[14]

The State contends that the evidence relating to IA #00-38 would be inadmissible because the investigation was too remote in time. In support, the State relies on *State v. Gregory*, 158 Wn.2d 759, 147 P.3d 1201 (2006), and *State v. Lord*, 117 Wn.2d 829, 822 P.2d 177 (1991). *Gregory*, however, held that evidence where the victim had lied, even when not under oath, was likely admissible under ER 608(b). 158 Wn.2d at 798-99. And, in *Lord*, the court considered admissibility of evidence under ER 608(a), not ER 608(b). 117 Wn.2d at 874-75. Thus, neither *Gregory*, 158 Wn.2d 759, nor *Lord*, 117 Wn.2d 829, support the State's argument that evidence relating to IA #00-38 is inadmissible.

We are not ultimately concerned with the concrete admissibility of withheld evidence; instead, we are concerned with the materiality of the withheld evidence and the effect of any potentially resulting prejudice. *Price*, 566 F.3d at 911-12. Without evidence relating to IA #00-38, the sexual harassment and assault allegations, and IA #02-33, the defense was not able to

---

[14] Griffin seems to claim that IA #02-33 would be admissible to show that Wilken had a "pattern of running afoul of police department polices." PRP at 17. Griffin does not cite any law or evidentiary rule to support that IA #02-33 would be admissible.

impeach the veracity of Wilken's investigation and testimony. Wilken's testimony validated the story Alexander told to the jury. Alexander was the only witness to testify with firsthand knowledge that Griffin committed the crime, and Alexander's credibility was in question because of his plea deal with the State and the victim identifying Alexander as the perpetrator. Had the State disclosed the evidence relating to IA #00-38, the criminal investigation, and IA #02-33, Griffin could have used that evidence to discredit Wilken, whose testimony validated the State's theory and discredited the victim's identification of Alexander as his assailant. Given the nature and extent of evidence withheld, there is a reasonable probability that the outcome of Griffin's trial would have been different had evidence relating to IA #00-38, the criminal investigation, and IA #02-33 been disclosed to the defense.

Therefore, we hold that the State violated *Brady* by failing to disclose evidence relating to Wilken. And the State's violation had a reasonable probability of affecting the outcome of Griffin's trial, thereby, prejudicing Griffin.

C. INEFFECTIVE ASSISTANCE OF COUNSEL

Griffin argues he received ineffective assistance of counsel in three ways. First, Griffin claims his trial counsel did not adequately investigate Wilken's conduct to impeach Wilken's testimony. Second, Griffin claims his trial counsel failed to impeach Alexander's testimony and Wilken's testimony on Alexander's statements. And, third, Griffin claims he was prejudiced by his attorney's failure to object to prosecutorial misconduct. We hold that Griffin was prejudiced by his trial counsel's failure to object to improper vouching evidence during the prosecution's case in chief.

24

The right to effective assistance of counsel is afforded criminal defendants by the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution. *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Thomas*, 109 Wn.2d 222, 229, 743 P.2d 816 (1987). Our Supreme Court has held that a personal restraint petitioner meets his burden to show actual and substantial prejudice when he makes a successful ineffective assistance of counsel showing under *Strickland*. *In re Crace*, 174 Wn.2d at 842.

To establish ineffective assistance of counsel, Griffin must show both deficient performance and resulting prejudice. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Deficient performance occurs when counsel's performance falls below an objective standard of reasonableness. *State v. Stenson*, 132 Wn.2d 668, 705, 940 P.2d 1239 (1997), *cert. denied*, 523 U.S. 1008 (1998). To show prejudice, Griffin must demonstrate that there is a probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *McFarland*, 127 Wn.2d at 335. If Griffin fails to satisfy either prong, we need not inquire further. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). There is a strong presumption of effective assistance, and Griffin bears the burden of demonstrating the absence of a strategic reason for the challenged conduct. *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002).

We view the decisions whether and when to object as "classic example[s] of trial tactics." *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662, *review denied*, 113 Wn.2d 1002 (1989). "Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal." *State v. Johnston*, 143 Wn. App. 1, 19,

177 P.3d 1127 (2007) (quoting *Madison*, 53 Wn. App. at 763). It is a legitimate trial tactic to forego an objection in circumstances where counsel wishes to avoid highlighting certain evidence. *Davis*, 152 Wn.2d at 714. Where a defendant bases his ineffective assistance of counsel claim on trial counsel's failure to object, the defendant must show that the objection would likely have succeeded. *State v. Gerdts*, 136 Wn. App. 720, 727, 150 P.3d 627 (2007).

1.      Investigation of Wilken

Griffin first asserts that his attorney "had an independent duty to conduct a full investigation" into Wilken's prior conduct. PRP at 24-25. Griffin provides no legal support or supporting argument for this assertion.[15] Moreover, Griffin does not provide any evidence to suggest his attorney did not investigate Wilken's prior conduct.

The record shows Griffin's attorney discovered, through his own investigation, that Wilken had been put on administrative leave. The record also shows that Griffin's attorney asked the court to have the prosecution turn over the information so that he could determine if the information might have an effect on the case. Finally, the record shows that Griffin's attorney saw the prosecution give the trial court a sealed file, containing an unknown amount and unknown type of information, for an in camera review, and the trial court determined the information did not need to be disclosed to Griffin's attorney. In his petition, Griffin does not offer any argument or citation to authority as to how his attorney's performance fell below an objective standard of

---

[15] We do not consider assertions without argument or authority. RAP 10.3(a)(6); *Cowiche Canyon Conservancy*, 118 Wn.2d at 809. Moreover, "[w]here no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none." *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962).

reasonableness. *Stenson*, 132 Wn.2d at 705. Therefore, Griffin's claim fails because he cannot establish that his trial counsel was deficient.

2.      Impeaching on a Prior Inconsistent Statement

Griffin asserts that his attorney was ineffective for failing to impeach both Alexander and Wilken. This argument is based on Alexander's statement to Wilken in Alexander's second interview with Wilken before Alexander had been offered a plea, where Alexander described the timeline of events leading up to the robbery. The transcribed record of Alexander's statement is ambiguous at best, and thus we hold that Griffin's attorney was not deficient in failing to use it to impeach Alexander and Wilken.

Griffin points to the following exchange between Alexander and Wilken as showing Alexander's prior inconsistent statement is as follows:

[Wilken]:      And what did those two [Griffin and Perkins] do?

[Alexander]:   Um they (unintelligible) and then they came back and I walked . . . I wanted something to drink so I walked to [the convenience store].

[Wilken]:      Okay.

[Alexander]:   Got something to drink. Well, actually, went to (unintelligible) and then left and went back, you know, (unintelligible). They got in the car, (unintelligible) I mean, I didn't think, you know what I'm saying, that they was [sic] going to go . . . go over there for real.

PRP Ex. 16, at 44. Griffin contends that this statement does "not contain any mention of going back to the mini-mart" where Griffin was seen on camera, by himself, buying a beer shortly before midnight. PRP at 27. Therefore, when Alexander testified at trial that he and Perkins had gone with Griffin back to the mini-mart so that Griffin could buy a beer, Griffin's attorney should have impeached Alexander with this statement that he made to Wilken. Similarly, Griffin contends that

his attorney should have used this statement to impeach Wilken when Wilken testified that Alexander's story to the jury was consistent with the story he told before being offered a plea deal. And, Griffin further contends his attorney should have impeached Wilken's police report wherein Wilken states Alexander told him that Alexander had been with Griffin when Griffin bought the beer on the way to commit the robbery.

Griffin must establish that counsel's performance for failing to bring Alexander's statement to attention of the trial court and the jury fell below an objective standard of reasonableness. *Stenson*, 132 Wn.2d at 705. Reading Alexander's statement, it is impossible to determine where Alexander is saying he "went back" to—he could either be referring to going back to somewhere other than the mini-mart, as Griffin asserts, or Alexander could be referring to going back to the mini-mart, as the State asserts. PRP Ex. 16, at 44. We do not hold that Griffin's trial counsel's performance was deficient for not arguing the existence of a prior inconsistent statement when it is questionable whether a prior inconsistent statement existed. Therefore, having failed to establish that his trial counsel's performance was deficient, this argument for ineffective assistance of counsel fails as well.

3.    Failure to Object to Prosecutorial Misconduct

Griffin argues he was prejudiced by ineffective assistance of counsel when his attorney failed to object to questions and comments made by the prosecutor during the State's case in chief, closing argument, and rebuttal. Griffin contends the prosecutor improperly vouched for the credibility of Alexander during the State's case in chief and closing argument. We hold that Griffin's trial counsel was deficient in failing to object to the misconduct and the petition should

be granted because there is a reasonable probability that the failure to object affected the outcome of the trial.

Where a defendant bases his or her ineffective assistance of counsel claim on trial counsel's failure to object, the defendant must show that the objection likely would have succeeded. *Gerdts*, 136 Wn. App. at 727. Therefore, we examine the underlying claim of prosecutorial misconduct.

To prevail on a claim of prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). First, we determine whether the prosecutor's conduct was improper. *Id.* at 759. If the prosecutor's conduct was improper, the question turns to whether the prosecutor's improper conduct resulted in prejudice. *Id.* at 760-61. Prejudice is established by showing a substantial likelihood that the prosecutor's misconduct affected the verdict. *Id.* at 760.

A prosecutor commits misconduct by personally vouching for a witness's credibility or veracity. *State v. Brett*, 126 Wn.2d 136, 175, 892 P.2d 29 (1995), *cert. denied*, 516 U.S. 1121 (1996); *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010). "Improper vouching generally occurs (1) if the prosecutor expresses his or her personal belief as to the veracity of the witness or (2) if the prosecutor indicates that evidence not presented at trial supports the witness's testimony." *Ish*, 170 Wn.2d at 196.

Prosecutors have "wide latitude in closing argument to draw reasonable inferences from the evidence and may freely comment on witness credibility based on the evidence." *State v. Lewis*, 156 Wn. App. 230, 240, 233 P.3d 891 (2010). Typically, closing arguments made by prosecutors do not constitute improper vouching for witness credibility unless it is clear that the prosecutor is not arguing an inference from the evidence but, instead, is expressing a personal

opinion about witness credibility. *State v. Warren*, 165 Wn.2d 17, 30, 195 P.3d 940 (2008), *cert. denied*, 556 U.S. 1192 (2009).

        a.       Prosecution's Case in Chief

First, Griffin argues the prosecutor committed misconduct during the State's case in chief when the prosecutor questioned Alexander about the plea agreement Alexander had made to testify favorably in exchange for reduced charges and then introduced the plea agreement into evidence. Griffin specifically identifies as misconduct the part of Alexander's testimony where the State elicited testimony that Alexander has to testify truthfully in order to get the reduced charges. The pertinent part of the testimony follows:

[Prosecutor]:  So, what is it you're supposed to do?

[Alexander]:  Tell the truth.

[Prosecutor]:  Okay. In this trial?

[Alexander]:  Yes.

. . . .

[Prosecutor]:  Okay. All right. And are there terms in that contract that say what happens if you are not truthful in your testimony, you know, what happens if you're not truthful?

[Alexander]:  Yeah.

[Prosecutor]:  What does it say happens?

[Alexander]:  That I'll get the full range of two charges.

VRP at 286-87. No objection was entered by defense counsel during this testimony and defense counsel told the trial court that the defense did not object to the agreement being entered into evidence. Griffin contends this failure to object constitutes reversible ineffective assistance of

counsel. We agree that Griffin's trial counsel was deficient for failing to enter an objection and that Griffin was prejudiced by his trial counsel's failure to object.

In *State v. Ish*,[16] the trial court admitted evidence of a plea agreement between the State and Ish's cellmate, and allowed the State to question the cellmate about the agreement on direct examination. 170 Wn.2d at 193, 196-97. The agreement contained several statements indicating that the cellmate "agree[d] to provide 'a complete and truthful statement,' to 'testify truthfully,' and to 'have told the truth, to the best of his knowledge.'" *Id.* at 193 (emphasis omitted). On direct examination, the prosecutor established that the State agreed to reduce the cellmate's charges in an unrelated matter in exchange for his testimony against Ish. *Id.* at 192, 194. The prosecutor asked, "With regard to exchanging testimony in this case, what type of testimony?" to which the witness answered, "Truthful testimony." *Id.* at 194. On redirect, the prosecutor implied that the State would revoke the agreement if the witness breached it, and he then reiterated the agreement's use of "truthfully." *Id.* Finally, the prosecutor asked, "Have you testified truthfully?" to which the witness answered, "Yes, I have." *Id.* at 194.

The *Ish* court held that admitting the plea agreement and the prosecutor's subsequent questioning constituted vouching by the prosecutor.[17] *Id.* at 201. The court reasoned:

> Evidence that a witness has promised to give "truthful testimony" in exchange for reduced charges may indicate to a jury that the prosecution has some independent means of ensuring that the witness complies with the terms of the agreement. While

---

[16] *Ish* was decided after Griffin's trial. However, our Supreme Court in *Ish* adopted the reasoning used in *State v. Green*, 119 Wn. App. 15, 23-24, 79 P.3d 460 (2003), which was the controlling law at the time of Griffin's trial.

[17] *Ish* was a plurality opinion, but a majority of the justices agreed that the prosecutor improperly vouched for the witness's credibility. 170 Wn.2d at 199-200 (plurality opinion), 206 (Sanders, J., dissenting).

such evidence may help bolster the credibility of the witness among some jurors, it is generally self-serving, irrelevant, and may amount to vouching, particularly if admitted during the State's case in chief. "[P]rosecutorial remarks implying that the government is motivating the witness to testify truthfully: '. . . are prosecutorial overkill.'" [*United States v.*] *Roberts,* 618 F.2d [530,] 536 (second alteration in original) (quoting *United States v. Arroyo–Angulo,* 580 F.2d 1137, 1150 (2d Cir. 1978) (Friendly, J., concurring)). We agree with the court's conclusion in *Green* that evidence that a witness has agreed to testify truthfully generally has little probative value and should not be admitted as part of the State's case in chief. Evidence is not admissible merely because it is contained in an agreement, and reference to irrelevant or prejudicial matters should be excluded or redacted. [*State v.*] *Green*, 119 Wn. App. [15,] 24, 79 P.3d 460 (2003); *see also* [*State v.*] *Jessup,* 31 Wn. App. [304,] 316, 641 P.2d 1185; *Roberts*, 618 F.2d at 536.

*Id.* at 198.

Here, the plea agreement was admitted into evidence without objection, and the State questioned Alexander on direct examination about his obligation under the agreement to tell the truth. Under *Ish*, this constitutes vouching by the prosecution and the trial court likely would have prohibited it, had an objection been entered. *Id.* at 201 ("Evidence that a witness has entered into a formal agreement with the State to testify truthfully should be excluded during direct examination."). Thus, Griffin's trial counsel was deficient for failing to enter an objection.

Also, Griffin was prejudiced by his trial counsel's failure to object. To show prejudice for ineffective assistance of counsel, Griffin must demonstrate that there is a reasonable probability that, but for counsel's deficient performance in failing to object, the result of the proceeding would have been different. *McFarland*, 127 Wn.2d at 335.

Here, there is a reasonable probability that the result of the proceeding would have been different had defense counsel objected. The evidence presented at trial against Griffin was not overwhelming. The evidence against Griffin consisted of the glove found at a nearby apartment complex with his DNA and others' on it, his asking Green to use her phone late on an unknown

night, and Alexander's testimony. Alexander's testimony naming Griffin as one of Atkinson's assailants was the only evidence presented at trial that linked the glove to its possible use in the crime.[18] Alexander's testimony was also the only evidence that created an alternative reason, and provided a date, for Griffin's presence at Green's apartment. Finally, Alexander's testimony was the only evidence presented at trial that put Griffin at Atkinson's door attempting the robbery, and contradicted the evidence of Atkinson's identification of Alexander and the footage of Griffin alone at the mini-mart shortly before midnight.

Had defense counsel objected, the trial court would have been able to limit the improper vouching evidence and/or issue a curative instruction. A curative instruction would have eliminated the credibility imparted onto Alexander's testimony through the State's improper vouching, and the jury would have been in a better position to judge Alexander's credibility independently. Therefore, but for trial counsel's failure to object, "there is a reasonable probability that" "the result of the proceeding would have been different." *McFarland*, 127 Wn.2d at 335.

Thus, there is a reasonable probability that had defense counsel objected, the objection would likely have been sustained. Griffin has shown that defense counsel was deficient for failing to object to the prosecutor's vouching during the State's case in chief.

b.      Prosecution's Closing and Rebuttal

Griffin claims that he received ineffective assistance of counsel when defense counsel failed to object to the State's closing argument and rebuttal closing argument. Griffin cites four

---

[18] Even this link was weak. Alexander testified that he did not know if Griffin or Perkins were wearing gloves. He testified that Griffin had gotten gloves out of his apartment.

instances that defense counsel should have objected. Griffin does not support any of his claims relating to these instances with applicable legal argument, and therefore, his claims fail.

First, Griffin points to the following in the prosecutor's closing:

Well, [Atkinson] certainly when he testifies he knows Garry Alexander's behind this. I mean, he knows Garry Alexander is one of the three charged co-defendants in this. So he obviously, you know, isn't gonna have any big moral dilemma testifying that Garry Alexander is one of them.

VRP at 442-43.

To support his contention that this was improper, Griffin cites *State v. Fleming* for the following general proposition: "it is misconduct for a prosecutor to argue that in order to acquit a defendant, the jury must find that the State's witnesses are either lying or mistaken." 83 Wn. App. 209, 213, 921 P.2d 1076 (1996), *review denied*, 131 Wn.2d 1018 (1997). Griffin does not provide any other analysis. The prosecutor's statements here are not similar to those made by the prosecutor in *Fleming*. The prosecutor in *Fleming* said, "for you to find the defendants . . . not guilty . . . you would have to find either that [D.S.] has lied about what occurred in that bedroom or that she was confused; essentially that she fantasized what occurred back in that bedroom." 83 Wn. App. at 213 (emphasis omitted). Without any argument as to how *Fleming* is applicable, this claim fails.

Second, Griffin points to the following in the prosecutor's closing:

You know, something that you can do as jurors is just think about Garry Alexander's testimony. I submit to you that he came across as a forthright witness. He did not hold back. In fact, when he's being confronted with this idea of doing a deal where he has to tell the truth about everything, at that point, you know, months after he confessed, he admits, well, we actually planned to do it a week earlier but nobody's home that time. You know, so he's—he's not holding anything back.

34

And when he testifies, he—he doesn't try to sugarcoat anything, he doesn't try to sugarcoat his involvement, he's like, you know, yeah, we—we were doin' this thing.

. . . .

But he—he didn't pull any punches on the stand, you know, he didn't try to sugarcoat his involvement, and on cross-examination by Defense counsel, he, you know, admitted to everything. All right.

So I submit to you that he comes off in his presentation on the witness stand as a guy who was involved in this but is forthright in what his involvement was.

VRP at 449-50.

Griffin contends that this was improper vouching "in two of the ways outlined in *United States v. Brooks*, 508 F.3d at 1209." PRP at 36. Griffin also cites *Ish*, to say that "[b]y making this statement, the prosecutor 'expresse[d] his . . . personal belief as to the veracity of the witness.'" PRP at 36 (quoting *Ish*, 170 Wn.2d at 196). Again, Griffin does not provide any further argument as to how either *Brooks* or *Ish* apply. Both *Brooks* and *Ish* considered the prosecution's examination of witnesses during the prosecution's case in chief. Here, however, Griffin claims error in the prosecution's closing and provides no argument as to how the discussions in *Brooks* or in *Ish* apply. Consequently, this claim fails.

Third, Griffin points to the following in the prosecutor's closing:

So I encourage you to think about, you know, who a deal should be made with in this scenario. Certainly not one of the guys at the door that's involved in the actual shooting of the victim, but the driver. That's the guy that makes sense to make a deal with, just like if it's a bank robbery and you have a, you know, a driver and guys that go in and rob the bank, it's most likely the deal would be made with the driver, and that's what happens here.

VRP at 446-47.

Griffin's claim of error for these statements is not accompanied by any legal argument or citation to legal authority. "[W]here no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none." *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193, 195 (1962). Consequently, this claim fails. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992); RAP 10.3(a)(6).

Finally, Griffin points to the following in the prosecutor's rebuttal:

> The polygraph. Remember, you can look at that contract that the defendant signed, and you can see that throughout that contract it's all hinged on the defendant giving truthful statements that—at all interviews, pretrial interviews, testimony and in any proceeding in the matter of this defendant and Christopher Perkins.
>
> The defendant knows full well, it's very clear on that contract, he can be given a polygraph at any time. If he fails, that could be used against him to pull his deal. He knows that. And he knows that when he's testifying. All right. So you can see that in the contract.

VRP at 489.

Griffin contends that this was error and quotes *Ish*, 170 Wn.2d at 198, for the general proposition that "'[P]rosecutorial remarks implying that the government is motivating the witness to testify truthfully: '. . . are prosecutorial overkill.'" PRP at 38 (quoting *Ish*, 170 Wn.2d at 198). But *Ish* did not consider prosecutorial misconduct during closing arguments; rather, the *Ish* court considered evidence elicited through the prosecution's direct examination. 170 Wn.2d at 201 ("Evidence that a witness has entered into a formal agreement with the State to testify truthfully should be excluded *during direct examination*.") (emphasis added).

Moreover, the *Ish* court explicitly stated that the prosecution would be allowed to point out the witness's contractual obligation to testify truthfully if the defendant brought it up. 170 Wn.2d

at 199 ("If the agreement contains provisions requiring the witness to give truthful testimony, the State is entitled to point out this fact on redirect if the defendant has previously attacked the witness's credibility."). Here, the defense in closing argument first introduced the provision for a polygraph test in Alexander's plea agreement. In the defense's closing argument, defense counsel argued:

> [Y]ou'll notice in the cooperation agreement, which will be back in the jury room, it's on page 2, and [Alexander] agreed to take a polygraph test to determine the truth of his story. The State didn't do one. They had him take a polygraph test prior, before he came up with the new story, but after the story, the State had the ability to do a polygraph test, they chose not to.

VRP at 483.

Griffin provides no argument as to how *Ish* applies. However, even if Griffin had provided a substantive legal argument on this claim, his argument would still fail because the defense opened the door to the State's rebuttal. Prosecutors are afforded "wide latitude in closing argument to draw reasonable inferences from the evidence and may freely comment on witness credibility based on the evidence," *Lewis*, 156 Wn. App. at 240, and the State is entitled to point out provisions of the agreement with a witness that require the witness to testify truthfully if that witness's credibility has first been attacked, *Ish*, 170 Wn.2d at 199. Therefore, we hold Griffin's ineffective assistance of counsel claim fails.

D.    PROSECUTORIAL MISCONDUCT

Griffin claims that the prosecutor committed prejudicial misconduct. Specifically, Griffin argues that the prosecutor improperly vouched for the credibility of Alexander during the State's

case in chief and closing argument.[19]  We hold that Griffin's argument fails because he does not establish that a curative instruction would not have obviated any resulting prejudice.[20]

If a defendant does not object at trial, he or she is deemed to have waived any error unless the prosecutor's misconduct was so flagrant and ill-intentioned that an instruction could not have cured any resulting prejudice.  *Emery*, 174 Wn.2d at 760-61.  Under this heightened standard of review, the defendant must show misconduct and that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'"  *Emery*, 174 Wn.2d at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).  In making that determination, we "focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured."  *Emery*, 174 Wn.2d at 762.

Here, Griffin tells this court "[i]t's hard to conceive what instruction" could have cured the prejudice he claims to have suffered, but he does not make any argument to show how a curative instruction would not have obviated any prejudicial effect on the jury.  PRP at 43; *Emery*, 174 Wn.2d at 761.  That a curative instruction is hard for Griffin to think of, does not satisfy his burden of proof under *Emery*.  Griffin also does not present any argument to show how or whether any

---

[19] Griffin does not cite to any conduct by the prosecutor in the prosecutorial misconduct section of his brief.  He is presumably relying on the prosecutor's actions he points to in his ineffective assistance of counsel argument, so those are addressed in this opinion.

[20] The extent of Griffin's argument as to why a curative instruction would not obviate any prejudice consists of the following sentence: "It's hard to conceive what instruction could have adequately informed the jury that they need not decide whether the government made a mistake in giving Alexander a deal."  PRP at 43.  This argument is not supported by citation to case law or the record.  Thus, we do not consider this argument.  RAP 10.3(a)(6); *Cowiche Canyon*, 118 Wn.2d at 809; *DeHeer*, 60 Wn.2d at 126.

resulting prejudice existed and "'had a substantial likelihood of affecting the jury verdict.'" *Emery*, 174 Wn.2d at 761 (quoting *Thorgerson*, 172 Wn.2d at 455). Thus, having failed to establish both prongs of *Emery*, Griffin's claims for prosecutorial misconduct fails.

E.      CUMULATIVE ERROR BASED ON *BRADY* AND *STRICKLAND* VIOLATIONS

Finally, Griffin argues that the cumulative effect of the errors he alleges above undermines the confidence in the outcome of his trial. Under the cumulative error doctrine, the appellate court will reverse a trial court verdict when it appears reasonably probable that the cumulative effect of errors materially affected the outcome, even when no one error alone mandates reversal. *State v. Russell*, 125 Wn.2d 24, 93, 882 P.2d 747 (1994); *State v. Johnson*, 90 Wn. App. 54, 74, 950 P.2d 981 (1998). Because we hold that Griffin has established *Brady* and *Strickland* errors independently warranting reversal under *Crace*, 174 Wn.2d 835, we do not consider this argument.

F.      CONCLUSION

In conclusion, we grant Griffin's petition and remand for new trial because the State failed to disclose *Brady* evidence favorable to Griffin that, in the aggregate, create a reasonable probability that the outcome of the proceedings would have been different. We also grant Griffin's petition and remand for new trial because he received ineffective assistance of counsel when trial counsel failed to object to the prosecutor's improper vouching during the State's case in chief and had his trial counsel objected, there is a reasonable probability that the outcome of the proceedings

would have been different. We dismiss Griffin's prosecutorial misconduct argument because he fails to establish that a curative instruction could not have obviated the prejudice. Finally, we do not consider Griffin's argument that the cumulative effect of the State's failure to disclose and ineffective counsel claims because these errors independently warrant reversal.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Lee, J.

We concur:

_____
Johanson, P.J.

_____
Sutton, J.